S94A1451. BROOKS et al. v. PARKERSON.
(454 SE2d 769)

HUNT, Chief Justice.
   This appeal presents the issue of the constitutionality of Georgia's "Grandparent Visitation Statute," OCGA § 19-7-3. We hold that the statute is unconstitutional under both our state and federal constitutions, and reverse the trial court's order to the contrary.
   Parkerson, the child's maternal grandmother, filed a petition for visitation under OCGA § 19-7-3. The petition was opposed by both the child's parents, Stacy and William Brooks, who filed a motion to dismiss, challenging the constitutionality of the statute. We granted the parents' application to appeal from the trial court's denial of that motion, and asked the parties to address the issues of the constitu-

tionality of the statute and, assuming its constitutionality, the appropriate burden of proof in grandparent visitation cases.[1] Because we find the statute unconstitutional, we need not reach the second question.

1. *The Statute.*

The Grandparent Visitation Statute, OCGA § 19-7-3, enacted substantially in its present form in 1988,[2] grants any grandparent the right to seek visitation of a minor grandchild in three ways: by filing an original action for visitation rights, by intervening in certain existing actions including those where the custody of a minor child is in issue, or by proceeding where there has been an adoption in which the adopted child has been adopted by the child's blood relative or a stepparent. OCGA § 19-7-3 (b). The statute further provides that "the court may grant any grandparent of the child reasonable visitation rights upon proof of special circumstances which make such visitation rights necessary to the best interests of the child." OCGA § 19-7-3 (c).

2. *Constitutionality of the Statute.*

In recent years legislatures in all 50 states have enacted statutes giving grandparents visitation rights. See Comment, The Coming Of Age Of Grandparent Visitation Rights, 43 The American University L. Rev. 563, 564 (1994).[3] A number of legal scholars, including the

---

[1] The trial court held the statute is constitutional and that grandparents have a burden of proving the appropriateness of visitation by clear and convincing evidence.

[2] At common law grandparents had no legal right of visitation with their grandchildren over the objections of the parents. See Note, Grandparents' Visitation Rights In Georgia, 29 Emory Law Journal 1083 (1980). The first Grandparents' Visitation Statute was enacted in this state in 1976, allowing the trial court, in its discretion, to grant reasonable visitation rights to a grandparent whenever the court had before it a question concerning the custody or guardianship of a child. Ga. Code Ann. § 74-112 (1976) (Ga. L. 1976, p. 247, § 1). The statute was amended and expanded in 1980 to authorize the trial court to grant reasonable visitation to grandparents in an existing case where the guardianship of a minor child was in issue, or where one parent had died and the survivor remarried, or where the parental rights of one of the parents had been terminated. Grandparents have the right to intervene in an existing action, or to file an original pleading if the grandparent was the parent of the minor child's deceased parent or the parent of the minor child's parent whose parental rights had been terminated. Ga. L. 1980, pp. 936-937. See *Smith v. Finstad*, 247 Ga. 603 (277 SE2d 736) (1981) upholding the constitutionality of the 1980 statute against a challenge that the retroactive application of that statute was unconstitutional. The 1980 statute gave grandparents the right to initiate an original action for visitation under limited circumstances. For a history of grandparent visitation in Georgia through 1980, see Note, 29 Emory Law Journal 1083, supra. The current statute allows a grandparent to bring an action for visitation under any circumstances (this has been referred, in some instances, to an "open-ended" grandparent visitation statute, see Bohl, Brave New Statutes: Grandparent Visitation As Unconstitutional Invasions of Family Life and Invalid Exercises of State Power, 3 George Mason Univ. Civil Rights L. Journal 271, 289 (1992)), except that an original petition may not be filed more than once in any two-year period. OCGA § 19-7-3 (c).

[3] For some of the reasons behind the proliferation of these statutes, see Comment, The Coming of Age of Grandparent Visitation Rights, 43 The American Univ. L. Rev. 563, fns. 3-

justices of the supreme courts of Tennessee, Kentucky and Missouri have debated both the advisability and constitutionality of these statutes.[4] In examining the constitutionality of our state's grandparent visitation statute, we examine first the interest which is constitutionally protected and, second the extent to which the state may infringe on that interest. Finally, we consider whether the statute is within the permissible scope of state infringement. In so doing, we are mindful of the rule that legislative enactments are presumptively constitutional. *Luther v. State*, 255 Ga. 706, 707 (342 SE2d 316) (1986).

(a) The Protected Interest.

The U. S. Supreme Court has long recognized a constitutionally protected interest of parents to raise their children without undue state interference. *Meyer v. Nebraska*, 262 U. S. 390, 399 (43 SC 625, 67 LE 1042) (1923) (state law prohibiting teaching in school of any modern language except English held unconstitutional. The liberty interest guaranteed by the Fourteenth Amendment includes freedom "to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children."); *Pierce v. Society of Sisters*, 268 U. S. 510, 534-535 (45 SC 571, 69 LE 1070) (1925) (law prohibiting parents from sending children to private rather than public schools unconstitutional because it would "unreasonably interfere with the liberty of parents . . . to direct the upbringing and education of [their] children."); *Prince v. Massachusetts*, 321 U. S. 158, 166 (64 SC 438, 88 LE 645) (1944) (child labor laws prohibiting female children under the age of 18 from selling magazines and periodicals constitutional notwithstanding that "the custody, care and nurture of the child reside first in the parents. . . . [I]t is in recognition of this that [our] decisions have respected the private realm of family life which the state cannot enter."); *Ginsberg v. New York*, 390 U. S. 629 (88 SC 1274, 20 LE2d 195) (1968) (the Court recognized general parental authority over children but upheld the state law limiting the availability of sex materials to minors); *Stanley v. Illinois*, 405 U. S. 645, 651-652 (92 SC 1208, 31 LE2d 551) (1972) (holding unconstitutional the Illinois law declaring that on

---

7 (1994); Fernandez, Grandparent Access: A Model Statute, 6 Yale Law and Policy Rev. 109, 115-117 (1988). We also note that in 1983, the U. S. Congress passed a resolution calling for the adoption of a uniform state act on grandparent visitation rights. S. Con. Res. 40, 98th Cong. 1st. Sess. 129 Cong. Reg. 13, 487 (1983).

[4] See generally Bohl, supra, n. 1; Fernandez, supra, n. 2; Note, The Constitutional Constraints on Grandparents' Visitation Statutes, 86 Columbia L. Rev. 118 (1986); Bean, Grandparent Visitation: Can the Parent Refuse?, 24 Journal of Family Law 393 (1985-86); Zaharoff, Access to Children: Towards a Model Statute for Third Parties, 15 Family Law Quarterly 165 (1981); *Hawk v. Hawk*, 855 SW2d 573 (Tenn. 1993); (holding unconstitutional Tennessee's grandparent visitation statute under the Tennessee constitution); *Herndon v. Tuhey*, 857 SW2d 203 (Mo. 1993) (upholding Missouri's grandparent visitation statute); and *King v. King*, 828 SW2d 630 (Ky. 1992) (upholding Kentucky's grandparent visitation statute).

death of the mother, children of unwed fathers become wards of the state. The Court noted that it had found protection of the family unit under the due process and equal protection clauses of the Fourteenth Amendment, and under the privacy aspects of the Ninth Amendment); *Wisconsin v. Yoder*, 406 U. S. 205, 235 (92 SC 1526, 32 LE2d 15) (1972) (exempting Amish from the state compulsory education law requiring children to attend school beyond the eighth grade); *Santosky v. Kramer*, 455 U. S. 745, 753 (102 SC 1388, 71 LE2d 599) (1982) (in determining the standard of proof necessary in termination of parental rights case, the Court noted its "historical recognition that freedom of personal choice in matters of family life is a fundamental liberty interest protected by the Fourteenth Amendment. . . . The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State."). Although the parents' right to rear children without state interference is largely expressed as a "liberty" interest, the Supreme Court has also noted that that right derives from privacy rights inherent in the constitution. See *Prince v. Massachusetts*, supra, 321 U. S. at 166; *Hawk v. Hawk*, 855 SW2d 573, 578-579, n. 3 (Tenn. 1993).

Parents have comparable interests under our state constitutional protections of liberty and privacy rights. "The right to the custody and control of one's child is a fiercely guarded right in our society and in our law. It is a right that should be infringed upon only under the most compelling circumstances." *In re: Suggs*, 249 Ga. 365, 367 (291 SE2d 233) (1982) (holding that clear and convincing evidence is necessary to support a finding of deprivation in order to remove a child from his or her parent); see also *In re Jane Doe*, 262 Ga. 389, 393 (2), n. 6 (418 SE2d 3) (1992); *In re Baby Girl Eason*, 257 Ga. 292, 297 (1) (358 SE2d 459) (1987); *In re S. E. H.*, 180 Ga. App. 849, 851 (350 SE2d 833) (1986); *In re L. H. R.*, 253 Ga. 439, 445 (321 SE2d 716) (1984) (" 'the law's concept of the family rests on a presumption that parents possess what a child lacks in maturity, experience, and capacity for judgment required for making life's difficult decisions.' " In holding that an infant's family may make the decision to terminate life-support systems without prior judicial approval, we recognized that "[t]he right of the parent to speak for the minor child is . . . imbedded in our tradition and common law. . . ." Id.). See also Art. I, Sec. I, Par. I, of the Constitution of the State of Georgia ("[N]o person shall be deprived of life, liberty or property except by due process of law"); *Bendiburg v. Dempsey*, 909 F2d 463, 470 (11th Cir. 1990).

(b) Permissible State Infringement.

Having determined the interest involved, we look now to the ex-

tent of permissible state infringement on that interest. The Supreme Court has made clear that state interference with a parent's right to raise children is justifiable only where the state acts in its police power to protect the child's health or welfare, and where parental decisions in the area would result in harm to the child. See generally Bean, 24 Journal of Family Law, supra, n. 3 at 407-413; *Hawk v. Hawk,* supra at 580-581; *Yoder,* supra, 406 U. S. at 230 (Amish children would not be *harmed* by receiving an Amish education rather than a public education); *Pierce,* 268 U. S. at 534 (parents' decisions to send their children to private schools were "not inherently *harmful.*"); *Meyer,* supra, 262 U. S. at 402-403 ("proficiency in a foreign language . . . is not *injurious* to the health, morals or understanding of the ordinary child"); compare *Prince v. Massachusetts,* 321 U. S. 158, 170, wherein the Supreme Court upheld the conviction of a parent who allowed her child to sell religious magazines, finding legitimate state interference designed to prevent "psychological or physical *injury*" to the child. (Emphasis supplied.)

Likewise, following the analysis of the Tennessee Supreme Court in interpreting its state statutes and constitutions, we find that implicit in Georgia cases, statutory and constitutional law is that state interference with parental rights to custody and control of children is permissible only where the health or welfare of a child is threatened. See generally *Hawk v. Hawk,* supra at 580; see, e.g., *In re: Suggs,* supra (clear and convincing proof of deprivation is necessary before parental rights may be terminated); *In re L. H. R.,* supra at 445; OCGA § 15-11-81 (the trial court must find clear and convincing evidence of parental misconduct or inability first before considering whether the termination of parental rights is in the child's best interest); OCGA § 19-9-3 (the harm from the termination of the relationship between the child's parents requires the court to "look to and determine solely what is for the best interest of the child or children and what will best promote their welfare and happiness"); OCGA § 19-7-4 (the court may order appropriate measures "for the welfare of the child," if a child is found "under circumstances of destitution and suffering, abandonment . . .").[5]

(c) The Constitutionality of Georgia's Grandparent Visitation Statute.

---

[5] Contrary to the position of the dissent, the "best interest of the child" standard does not come into play to permit interference with the custody and control of the child, over parental objection, unless and until there is a showing of *harm* to the child without that interference. To the extent *Evans v. Lane,* 8 Ga. App. 826, 831 (70 SE 603) (1910), cited by the dissent, stands for the proposition that a grandparent might be entitled to custody of the grandchild, rather than a fit parent because it is "the welfare of the little one" which is paramount, that opinion has clearly been overruled by our opinion in *Blackburn v. Blackburn,* 249 Ga. 689, 692 (292 SE2d 821) (1982).

With the foregoing in mind, we find the statute in question falls short both in its apparent attempt to provide for a child's welfare and in its failure to require a showing of harm before visitation can be ordered. First, while as noted above, the state may, in limited instances, interfere with parental decision-making to protect the health or welfare of children, there is insufficient evidence that supports the proposition that grandparents' visitation with their grandchildren always promotes the children's health or welfare. See Note, supra, n. 3, Columbia Law Rev. at pp. 123-125; Bohl, Brave New Statutes, supra, n. 3 at 294-298. But see Fernandez, supra, n. 2 at 109-110. While there are, to be sure, many instances where the grandparent-grandchild bond is beneficial to the child, we have found, and the parties cite, little evidence that this is most often the case. It has also been noted that even if such a bond exists and would benefit the child if maintained, the impact of a lawsuit to enforce maintenance of the bond over the parents' objection can only have a deleterious effect on the child. Bohl, supra at 296. Note, Columbia Law Rev. at 124. In so saying, we recognize that there are many grandparents who have a deep and significant bond with their grandchildren, and that we have an explicit policy in this state to "encourage that a minor child has continuing contact with parents and grandparents." OCGA § 19-9-3 (d).

However, even assuming grandparent visitation promotes the health and welfare of the child, the state may only impose that visitation over the parents' objections on a showing that failing to do so would be harmful to the child.[6] It is irrelevant, to this constitutional analysis, that it might, in many instances be "better" or "desirable" for a child to maintain contact with a grandparent. The statute in question is unconstitutional under both the state and federal constitutions because it does not clearly promote the health or welfare of the child and does not require a showing of harm before state interference is authorized. For the above and foregoing reasons, the trial court's denial of the parents' motion to dismiss is reversed.

*Judgment reversed. All the Justices concur, except Benham, P. J., and Hunstein, J., who dissent.*

---

[6] The dissent reasons that a less strenuous standard, the rational basis test, applies in determining the constitutionality of state interference under the Grandparent Statute. This is because, the dissent argues, the interference here is not "direct or substantial." We cannot agree. "Allowing the government to force upon an unwilling family a third party, even when the third party happens to be a grandparent, is a significant intrusion into the integral family unit." *Herndon v. Tuhey*, supra, n. 4 at 212 (Covington, J., dissenting). Moreover, this part of the dissent's analysis of the Grandparents' Visitation Statute begs the question. The statute is either constitutional or it is not. It cannot be constitutional, as the dissent argues, because there is only a "little" infringement on family autonomy. Rather, as we have noted, there is *no* constitutionally permissible infringement of parental rights to custody and control without a showing of harm to the child.

SEARS, Justice, concurring.

Both the majority and the dissent say much of Georgia's "Grandparent Visitation Statute," OCGA § 19-7-3, that today we declare unconstitutional. The statute makes the judicial process available for grandparents to use to require their children to provide them visitation rights with their grandchildren upon a showing of "special circumstances which make such visitation rights necessary to the best interest of the child." OCGA § 19-7-3 (c).

In sum, the dissent says that grandparents can be another layer of special people for children. I fully agree. The family requires the most delicate mixture of nature and convention, of human and divine, to subsist and thrive. Its base may be mere bodily reproduction, but its purpose is the formation and maintenance of civilized human beings. Grandparents can be important to the family mixture because children must receive knowledge of the things of the past as well as prescriptions for what ought to be in order to resist the philistinism of the present. Having found wisdom, learned patience, and journeyed in faith, many grandparents have much to give their grandchildren in the way of a vision of the world, as models of action, and may, as well, provide children with a very profound sense of connection with others.

However, as important as grandparents can be in the lives of their grandchildren, the relationship between parent and child is paramount. For this reason I cannot believe in either the constitutionality or the political correctness of any law that allows a court, using its own notions of what "special circumstances" are, to pierce the delicate, complex and sacred unity of parent and child against the wishes of fit parents and without a showing of absolute necessity. While I have no quarrel with governmental interference where a parent's conduct may injure a child emotionally or physically, interference on less than those grounds is contrary to our common law tradition of protecting the nuclear family as the foundation of society and leaving fit parents the exclusive right to determine what is in their children's best interest. Far from being outmoded, that tradition is critical today. In this indifferent, lackluster and frightened time, we need to protect the sanctity and shore up the security provided by our families more than at any other time I can think of.

The American family as an institution is vulnerable for many reasons, not the least of which are the weaknesses of its members who are, after all, only mortals. Implicit in the Western family as we know it, which generally consists of parents and their young children, are deep distresses that often accompany living in intimate, revealing relationships with minimum regulation and oversight from government or other entities. Parents can perpetuate many subtle as well as overt outrages against their children, from neglect to mayhem. When pa-

rental conduct is so vile as to injure a child, and parents cannot or will not reach out to others for help, government not only is authorized but is compelled to invade the intimacy and privacy of the parent-child relationship in order to provide children with a healthy alternative.

Even in so-called "good families," the engagement of child with mother and father, and husband with wife, can be intense, causing disappointment and pain. Mothers and fathers often feel their children's misfortunes and failures keenly; their rejection by peers, their abuse at the hands of callous adults, their awkwardness and their miscalculations. There is often wounded pride and astonished unbelief when the bright promise of the baby fades into the ordinariness of the school child. In the family the young adult struggles to shake off the bonds of parental love that expresses itself in solicitude and supervision. And for the parent whose child has made the necessary leap to freedom, there is the pain of letting go, of turning back to the silent house, the empty bed, the abandoned books, dolls and baseball bats.[7]

Turn all of this over, however, and in the vast majority of homes you will also discover tender devotion, the deepest pride and the most exultant joy — all experienced in the relationship between parent and child. It does not matter whether our child is brilliant or deficient, beautiful or homely, perfect or deformed, good or bad — he or she is ours, and most parents are committed to their children lastingly. Whether we rear our children on the right side of the tracks or the wrong, whether we are dunderheaded in politics or forward-looking enough to please our adventurous offspring, whether we are able to provide them with the things they think they need or we are limited to providing them with the things we know they must have, they are ours and, absent abuse and neglect, parents and their children have the right to "remain together without the coercive interference of the awesome power of the state." *Duchesne v. Sugarman*, 566 F2d 817, 825 (2nd Cir. 1977). Our law has always recognized that the relationship between parents and their children is the most mutually beneficial relationship possible, in an imperfect world, and in this country parents' decisions concerning visitation with a grandparent or anyone else have always been dictated, if at all, by moral and religious forces rather than legal ones.

If the relationship of parent to child were a more superficial one — as well might be the case under any statute that would involuntarily relieve a couple of the care of their young in favor of others under

---

[7] See generally Cox, "Marriage and the Family" Readings on the Psychology of Women (Harper & Row, 1972).

a subjective showing of "special circumstances" — such profound feelings as I have described could be diluted to mere concern, and for some the concern could become indifference. Relieved of intensity and stripped of privacy, the relationship between parents and their children could be less binding, not more, creating another wedge between parent and child and another excuse for parents to shirk their responsibilities. Furthermore, when the parent-child relationship is curtailed, even to accomplish a goal as laudable and seemingly benevolent as ensuring a child's connection with the parents of his mother or his father, over time some parents could come to feel less committed to their young in a time where more commitment is needed, and less inclined to ensure that their children got the essentials: authority, responsibility, attention and love.

Between parent and child, there is no monster like separateness. It can grow even faster than children, shutting first the heart, then the home, then history. The rights that some grandparents may seek under the liberal rules of the statute invalidated today could separate fit parents from responsibility for and authority over their children, thereby undermining the privacy and primacy of the American family. The statute cannot be allowed to stand.

BENHAM, Presiding Justice, dissenting.

I respectfully dissent from the majority's sweeping pronouncement that OCGA § 19-7-3, Georgia's "Grandparent Visitation Statute,"[8] violates the constitutions of both Georgia and the United States. I believe the majority has ignored long-standing rules of statutory construction and, in so doing, has placed Georgia in the vanguard of a minority of one.[9]

The judicial branch of this state has the constitutional power and duty to declare void legislative acts which violate the U. S. or Georgia Constitution; however, "the conflict between the act and the fundamental law must be clear and palpable before an act of a co-ordinate department of the government will be declared unconstitutional.

---

[8] The statute, as pertinent to the facts of the case at bar, states:

(b) Any grandparent shall have the right to file an original action for visitation rights to a minor child . . . .

(c) Upon the filing of an original action . . . under subsection (b) of this Code section, the court may grant any grandparent of the child reasonable visitation rights upon proof of special circumstances which make such visitation rights necessary to the best interests of the child. There shall be no presumption in favor of visitation by any grandparent; and the court shall have discretion to deny such visitation rights. . . .

[9] No state has declared a grandparent visitation statute violative of the U. S. Constitution. Tennessee, the only other state to find its grandparent visitation statute unconstitutional, based its holding on the Tennessee Constitution alone. *Hawk v. Hawk*, 855 SW2d 573, 582 (Tenn. 1993).

[Cits.]" *Lamons v. Yarbrough*, 206 Ga. 50, 57-58 (55 SE2d 551) (1949). We must presume that a statute is valid and constitutional until the contrary appears (*Williams v. Ragsdale*, 205 Ga. 274 (2) (53 SE2d 339) (1949)), and construe a statute in such a way as to find it constitutional. *Garner v. Harrison*, 260 Ga. 866, 868 (400 SE2d 925) (1991). "Language in [a statute] will be given a reasonable and sensible interpretation in order to carry out legislative intent and render [the statute] valid. [Cit.]" *Mayor &c. of Hapeville v. Anderson*, 246 Ga. 786, 787 (272 SE2d 713) (1980).

Instead of adhering to Georgia's principles of statutory interpretation when faced with a constitutional challenge, the majority simply follows the analysis of the Supreme Court of Tennessee in its decision in *Hawk v. Hawk*, 855 SW2d 573 (Tenn. 1993). The Tennessee court based its decision on the right to privacy it found in the Tennessee Constitution in 1992 (id. at 577), the determination that parental rights are a fundamental liberty interest under the Tennessee Constitution (id. at 579), "Tennessee's historically strong protection of parental rights" (id.), and the limitation of Tennessee's authority as parens patriae to interfere with parenting to situations wherein it was necessary to prevent serious harm to a child. Id. at 580.[10] However, what may fit Tennessee does not necessarily fit Georgia.

A person in Georgia has a constitutionally protected right to privacy. In addition to the right of privacy found in the penumbrae of the Ninth and Fourteenth Amendments to the U. S. Constitution (*Griswold v. Connecticut*, 381 U. S. 479 (85 SC 1678, 14 LE2d 510) (1965)), the Georgia Constitution protects a person's right to privacy. Over 90 years ago, this court assured all persons in Georgia of a right to privacy guaranteed by the state constitutional provision that no person could be deprived of liberty without due process of law. *Pavesich v. New England Life Ins. Co.*, 122 Ga. 190, 197 (50 SE 68) (1904). Parents in Georgia, as well as parents throughout the United

---

[10] The Tennessee decision was expressly limited to a determination of the constitutionality of Tennessee's grandparent visitation statute "as it applies to the decision of these married parents to deny the paternal grandparents visitation with their grandchildren." Id. at 575.

> When applied to married parents who have maintained continuous custody of their children and have acted as fit parents, [court-ordered grandparent visitation under the statute] constitutes an unconstitutional invasion of privacy rights under the Tennessee Constitution.

Id. at 582. The majority does not so limit its condemnation of the Georgia statute. In addition, I wish to note that, in 1993, a trial court ruled that OCGA § 19-7-3 (b) was unconstitutional insofar as it authorized court-ordered grandparent visitation after the grandchild had been adopted by a blood relative. The trial court determined that the visitation statute controverted the adoption statute and constituted an unreasonable intrusion upon the adoptive parents' child-rearing autonomy. *Massey v. Robinson*, Civ. Action No. 93-A-02922-2, Superior Court of Gwinnett County (Stark, J.). This Court affirmed that decision without opinion, pursuant to Rule 59 of the Rules of this court. 263 Ga. XXVII.

States, have a fundamental right, guaranteed by the liberty interest protected by the Fourteenth Amendment to the U. S. Constitution, to establish a home and direct the upbringing and education of their children without undue governmental interference. See *Pierce v. Society of Sisters*, 268 U. S. 510, 534 (45 SC 571, 69 LE 1070) (1925); *Meyer v. Nebraska*, 262 U. S. 390, 399 (43 SC 625, 67 LE 1042) (1923). However,

> the family itself is not beyond regulation in the public interest . . . . Acting to guard the general interest in youth's well being, the state as parens patriae may restrict the parent's control. . . . [T]he state has a wide range of power for limiting parental freedom and authority in things affecting the child's welfare . . . .

*Prince v. Massachusetts*, 321 U. S. 158, 166 (64 SC 438, 88 LE 645) (1944). "The well-being of its children is of course a subject within the State's constitutional power to regulate . . . ." *Ginsberg v. New York*, 390 U. S. 629, 639 (88 SC 1274, 20 LE2d 195) (1968). As parens patriae, the State "has a legitimate interest in protecting those individuals unable to protect themselves." *Blackburn v. Blackburn*, 249 Ga. 689, 692, n. 5 (292 SE2d 821) (1982). "[T]he parens patriae must protect the helpless and the innocent. They are the wards of the court, the hope of the State, and the seed corn of the future." *Williams v. Crosby*, 118 Ga. 296, 298 (45 SE 282) (1903). Acting as parens patriae, the government can require that children be educated, inoculated against disease, restrained when traveling in motor vehicles, forbidden employment under a certain age, protected from abuse, and required to be indoors during prescribed hours of the night. Thus, it is clear that the State may impose reasonable regulations that do not substantially interfere with the parents' fundamental right. *Zablocki v. Redhail*, 434 U. S. 374, 386 (98 SC 673, 54 LE2d 618) (1978). A legislative action that interferes with the parents' fundamental right must "directly and substantially" interfere with the parental right or "heavily burden" their liberty interest before the State's action will be subject to strict scrutiny. *Lyng v. Castillo*, 477 U. S. 635, 638 (106 SC 2727, 91 LE2d 527) (1986). Thus, the less rigorous standard of whether there is a "reasonable relationship to any end within the competency of the State" is applied when the interference is not direct and substantial and the liberty interest not heavily burdened. *Meyer v. Nebraska*, supra, 262 U. S. 390, 403.

Following Tennessee's lead, the majority maintains that the State's authority to assert itself as parens patriae "is permissible only where the health or welfare of a child is threatened." Majority, p. 193. However, in Georgia, the courts have acted as parens patriae when

considering such non-threatening items as a child's name change (*Fulghum v. Paul*, 229 Ga. 463 (192 SE2d 376) (1972)), and a purported father's petition of legitimation. *Mabry v. Tadlock*, 157 Ga. App. 257 (277 SE2d 688) (1981). In Georgia, the exercise of the parens patriae power has always had as its paramount consideration the best interests of the child (id.), and its exercise has become synonymous with the child's best interests and welfare.[11]

For decades, the courts of this state have recognized that the best interests of the child may often include contact with a grandparent, and have exercised judicial discretion to achieve that goal. In 1910, Judge Richard B. Russell pointed out that "[a widowed] father is not, as a matter of right, in all cases and under all circumstances entitled to the custody of his child," even when he is a proper person to raise a child, because it is "the welfare of the little one" which is paramount. *Evans v. Lane*, 8 Ga. App. 826, 831 (70 SE 603) (1910). The court noted that "welfare" included "that peacefulness of mind and sweet content upon which its happiness depends," and opined that the child

> surrounded with every accessory . . . of luxurious wealth, might be far less happy than she would be in receiving one tender stroke of the grand[parent]'s hand, or one loving look from the grand[parent]'s heart.

Id. at 831. In *Scott v. Scott*, 154 Ga. 659 (115 SE 2) (1922), this court recognized the right of a trial court to exercise its discretion and award grandparent visitation. In addition, the General Assembly has expressly stated that Georgia has a policy "to encourage that a minor child has continuing contact with . . . grandparents who have shown the ability to act in the best interest of the child. . . ." OCGA § 19-9-3 (d).

Other states have also noted that a court acts parens patriae when providing for grandparent visitation after finding it is in the best interest of the grandchild to do so. In rejecting a constitutional challenge to the Kansas statute authorizing court-ordered grandparent visitation, the Kansas Court of Appeals recognized the State's interest in protecting its children and assuring they receive proper care. The court concluded that "the parents' rights are subordinate to the State's paren[s] patriae powers and must yield when adverse to the best interests of the child. [Cit.]" *Spradling v. Harris*, 778 P2d 365, 367 (Kan. App. 1989). In *Sketo v. Brown*, 559 S2d 381, 382 (Fla. App.

---

[11] In *Harper v. Ballensinger*, 226 Ga. 828, 831 (177 SE2d 693) (1970), the court acknowledged the right of a child's sibling to institute a proceeding "in order that the court as parens patriae might inquire into the circumstances of the welfare of the child."

1990), the Florida Court of Appeals held that

> [t]he state has a sufficiently compelling interest in the welfare of children that it can provide for the continuation of relations between children and their grandparents under reasonable terms and conditions so long as that is in the children's interest.

The Supreme Court of New Hampshire has found the "better view" to be that a court, as an instrumentality of the State, "may use its parens patriae power to decide whether the welfare of the child warrants court-ordered visitation with grandparents . . . ." *Roberts v. Ward*, 493 A2d 478, 481 (N.H. 1985). New York "in its role as parens patriae has determined that, under certain limited circumstances, grandparents should have continuing contacts with the child's development if it is in the child's best interest." *People ex rel. Sibley v. Sheppard*, 429 NE2d 1049, 1052 (NY 1981). The Indiana Court of Appeals has concluded that Indiana's grandparent visitation statute "interferes with a parent's liberty interests only to observe its duty under the parens patriae doctrine and only upon a finding that it would be in the best interest of the child." *Bailey v. Menzie*, 542 NE2d 1015, 1020 (Ind. App. 1989). See also *R. T. v. J. E.*, 650 A2d 13 (N.J. Super. Ch. 1994) (upholding the New Jersey statute authorizing grandparent visitation if in the best interest of child against constitutional challenge); *Herndon v. Tuhey*, 857 SW2d 203 (Mo. 1993) (upholding the Missouri statute authorizing grandparent visitation if in child's best interest against constitutional challenge); *King v. King*, 828 SW2d 630 (Ky. 1992), cert. denied, ___ U. S.___ (113 SC 378, 121 LE2d 289) (1992) (upholding the Kentucky statute authorizing grandparent visitation against constitutional challenge if visitation is in the best interest of the child); *Deweese v. Crawford*, 520 SW2d 522 (Tex. Civ. App. 1975) (rejecting an attack on the constitutionality of the Texas statute authorizing grandparent visitation). The Supreme Court of New Hampshire summarized the dilemma which each of these courts faced:

> Parental autonomy is grounded in the assumption that natural parents raise their own children in nuclear families, consisting of a married couple and their children. . . . The realities of modern living, however, demonstrate that the validity of according almost absolute judicial deference to parental rights has become less compelling as the foundation upon which they are premised, the traditional nuclear family, has eroded . . . . More varied and complicated family situations arise as divorces, and decisions not to marry, result in single-

parent families; as remarriages create step-families; as some parents abandon their children; as others give them to temporary caretakers; and as still others are judged unfit to raise their own children. One of the frequent consequences, for children, of the decline of the traditional nuclear family is the formation of close personal attachments between them and adults outside of their immediate families. . . . It . . . [is] shortsighted indeed, for this court not to recognize the realities and complexities of modern family life, by holding today that a child has no rights, over the objection of a parent, to maintain a close extra-parental relationship. . . .

*Roberts v. Ward*, supra, 493 A2d 478, 481, citing Bartlett, Rethinking Parenthood as an Exclusive Status: The Need for Legal Alternatives when the Premise of the Nuclear Family Has Failed, 70 Va. Law Rev. 879 (1984).

The Georgia Grandparent Visitation Statute confers standing upon grandparents to apply to a court for the privilege of visiting with their grandchildren. *Sachs v. Walzer*, 242 Ga. 742 (251 SE2d 302) (1978). It does not confer a substantive or absolute right of visitation, but simply establishes a procedural vehicle through which grandparents may ask the court to allow visitation. It does not presume the existence of a beneficial relationship between grandparents and grandchildren. See *Hawk v. Hawk*, supra, 855 SW2d at 581, where the Tennessee Supreme Court sought "to avoid the 'unquestioning judicial assumption' that grandparent-grandchild relationships always benefit children. . . ." Rather, it requires grandparents to establish "special circumstances which make such visitation rights necessary to the best interests of the child." OCGA § 19-7-3 (c). In essence, the statute codifies what Georgia courts have been doing for years — providing for grandparent visitation after it is established that such visitation is in the best interests of the child.

Our statute is a legitimate exercise of the General Assembly's power to balance the competing interests of children, their parents, and their grandparents. The statute is an embodiment of the expressed policy of this state "to encourage that a minor child has continuing contact with . . . grandparents who have shown the ability to act in the best interest of the child. . . ." OCGA § 19-9-3 (d). The limited infringement upon parental rights by the Grandparent Visitation Statute is not of the magnitude of the infringement of parental rights that was involved in *In re: Suggs* 249 Ga. 365 (291 SE2d 233) (1982), cited by the majority. In that case, the permanent *termination* of parental rights was at issue; in the case at bar, we are examining a statute that provides a means by which grandparents can *seek tempo-*

*rary* visitation when that is found to be in the child's best interest.[12] Our statute does not directly or substantially interfere with the parental right, and is rationally related to a legitimate legislative goal. Under the rules of statutory construction when the constitutionality of legislation is questioned, it is constitutional.

For over 80 years the appellate courts of Georgia have recognized the authority of a trial court to exercise its discretion and provide for visitation between grandparents and grandchildren when it was in the best interest of the children involved. See *Scott v. Scott*, 154 Ga. 659, supra; and *Evans v. Lane*, 8 Ga. App. 826, supra. The majority now holds that the legislative act giving grandparents standing to ask for visitation and codifying the judicial practice of providing for such visitation when it was in the child's best interest is unconstitutional. "While the court may not agree with the wisdom of the statute, we are not authorized to second guess the legislature." *Celotex Corp. v. St. Joseph Hosp.*, 259 Ga. 108, 111 (376 SE2d 880) (1989) (Hunt, J., dissenting). As I cannot join my colleagues in second-guessing the legislature, I dissent from their holding that the Grandparent Visitation Statute is not constitutional.

I am authorized to state that Justice Hunstein joins this dissent.

DECIDED MARCH 17, 1995.

*Sutton & McCreary, Timothy A. McCreary*, for appellants.
*Lela S. Bridgers, Robert E. Flournoy III*, for appellee.

---

[12] The majority also cites *In re L. H. R.*, 253 Ga. 439 (321 SE2d 716) (1984), which involved the circumstances under which life-support systems might be removed from "a terminally ill [infant] existing in a chronic vegetative state with no hope of development of cognitive function." Id. This court determined that the child's parent or legal guardian could exercise the constitutional right to refuse or to terminate medical treatment, *but only* after the attending physician rendered a diagnosis and prognosis of terminal illness with no hope of recovery and current existence in a chronic vegetative state with no reasonable possibility of attaining cognitive function, and two disinterested physicians concurred. Thus, the parental right concerning treatment of the child was not as free from interference as the majority might hope.