NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.



SUPREME COURT OF GEORGIA
Case No. S25C1128

October 15, 2025

The Honorable Supreme Court met pursuant to adjournment.

The following order was passed:

REYNIER MARQUEZ v. RAFAEL E. AGUIRRE.

The Supreme Court today denied the petition for certiorari in this case.

*All the Justices concur, except LaGrua, J., who dissents and Land, J., disqualified.*

Court of Appeals Case No. A24A1759

**SUPREME COURT OF THE STATE OF GEORGIA**
Clerk's Office, Atlanta

I certify that the above is a true extract from the minutes of the Supreme Court of Georgia.
Witness my signature and the seal of said court hereto affixed the day and year last above written.

_____ , Clerk

BETHEL, Justice, concurring in the denial of certiorari.

This case implicates several important issues, including the definition of a father under Georgia law, the constitutional rights and interests associated with parenthood, the state's power to designate who holds those rights, and an apparent gap in Georgia law regarding the ability of a stranger to a marriage to challenge the statutory presumption of legitimacy afforded to children born to wedded parents. See generally OCGA § 19-7-20 et seq. Suffice it to say, I think this case presents issues of substantial gravity. Moreover, I believe the state of the law governing these issues remains unclear. Nevertheless, I concur in the denial of the petition for certiorari because I believe the decision of the Court of Appeals provides a workable system that is generally consistent with the precedent from this Court and from the Supreme Court of the United States addressing these issues (at least, I don't see it as inconsistent with that precedent). And because, in my view, the substantial policy questions existing within the apparent gap are best filled by legislative direction, I'm not inclined to alter the status quo by

2

judicial action. My purpose in writing separately is to highlight my perception of the weighty interests in play and the insufficient guidance our Code provides.

A brief and inexhaustive outline of the facts giving rise to this case should help contextualize the gap in Georgia law that I discuss below. In short, a married woman engaged in sexual intercourse with a man who was not her husband. The fruit of that congress was a child born inside the context of a marriage, though not a marriage between the child's biological parents. The wife remains married to the husband she had at the time of the child's conception and delivery, and they desire to raise the child as a product of their family. The wife's erstwhile paramour wishes to claim the child as his own and fill the role of father in the child's life, so he filed a petition to legitimate that child. The legal solution to this circumstance should be found at the intersection of the rights of the two men seeking to be the legal father of the child.[1]

---

[1] As an aside, I cannot help but note that, amid a challenging family situation, this child is fortunate to have two men who display every indication of a sincere and profound desire to bear the responsibility of fatherhood.

In Georgia, a child born to a married woman is presumed to be a legitimate child of the marriage. OCGA § 19-7-20(a). The presumption of legitimacy may be rebutted, however, in limited circumstances. See OCGA § 19-7-20(b) ("Where possibility of access exists, the strong presumption is in favor of legitimacy and the proof must be clear to establish the contrary."). Here, the husband and wife look to this provision of Georgia law to support their assertion that the presumption of legitimacy, having not been challenged by either of them, establishes the husband as the legal father of the child. Accordingly, they argue, any action by another seeking to name a different legal father, if permitted at all, must first seek the termination of the husband's parental relationship with the child pursuant to the provisions of OCGA § 15-11-310(a) (setting forth consent, mistreatment, extended failure to provide court-ordered support, abandonment, and dependency with a risk of harm as the

___

Moreover, the child appears fortunate to be in the home of a married couple who seek to maintain their family bond in the face of difficult challenges. In the event this child ever comes across this writing, I hope these adults will have continued to provide the same loving, supportive, and cooperative embrace for the child that they do now.

exclusive grounds for terminating parental rights). Essentially, they view the biological father's petition for legitimation as amounting to a preliminary action for termination of the husband's rights as the legal father followed by a traditional petition for legitimation.

This view finds support in dicta from this Court and in the decisions of the Court of Appeals. In *Brine v. Shipp*, we said — in the context of assessing the superior court's subject matter jurisdiction over the case — that a biological father's petition to legitimate a child born in wedlock "is in essence a petition to terminate the parental rights of the legal father." 291 Ga. 376, 379 (2012). *Brine* did not go so far as to conclude that the termination statute applied, but it did posit that "grant[ing] the legitimation petition required the superior court to first terminate the parental rights of the legal father." Id. at 380. See also *Mathenia v. Brumbelow*, 308 Ga. 714, 720 (2020) (noting that the adoption statute "does not limit the jurisdiction of superior courts to termination of parental rights only in adoption cases" but rather "expands the jurisdictional reach of superior courts to resolve

termination of parental rights issues beyond" adoption and now includes matters pertaining to legitimacy); *Davis v. LaBrec*, 274 Ga. 5, 7 (2001) (characterizing biological father's legitimation petition as seeking "to delegitimize a legitimate child and to break up a legally recognized family unit already in existence"). The decisions of the Court of Appeals in this context, while accepting the premise that termination is a predicate to legitimation, have not looked to the statutory provisions governing the termination of parental rights in reviewing rulings on legitimation petitions. Rather, these decisions have asked only whether biological paternity has been established and then moved directly to the "best interests of the child" standard that governs the legitimation process. See, e.g., *Marquez v. Aguirre*, 375 Ga. App. 202, 204 (2025) (noting that because the case is governed by the legitimation statute rather than the dependency or adoption statutes, the best-interests-of-the-child standard applies); *Sheppard v. Milsaps*, 374 Ga. App. 480, 487 (2025) (applying best-interests standard in reviewing ruling on petition for legitimation); *Jefferson v. O'Neal*, 364 Ga. App. 23, 25 (2022) (noting that "a higher

6

standard applies in legitimation cases where the child has an existing legal father, and the trial court is required to consider the best interests of the child").

Through the process of legitimation, Georgia law provides biological fathers with the opportunity to assert their claim to legal fatherhood. See OCGA § 19-7-22. A biological father "of a child born out of wedlock" may legitimate his child via the process laid out in the Code. Id. And in assessing a legitimation petition, the "best interests of the child standard" applies.[2] See *Baker v. Baker*, 276 Ga. 778, 780 (2003); *Davis*, 274 Ga. at 7; *Matter of J.M.S.*, 257 Ga. 630, 631 (1987).

But we have also noted that "[t]he law allowing the presumption of legitimacy to be rebutted was never intended to sever a child's ties with his or her legal father. In fact, the [legitimation statutes] were primarily intended to provide for the establishment rather than the dissolution of legitimacy and

---

[2] Effective July 1, 2016, the General Assembly amended OCGA § 19-7-22(d)(1) to require that legitimation petitions be decided under the "best interests of the child" standard.

paternity." *Baker*, 276 Ga. at 782. And this severance of the legal (but not biological) father's parental bond with and his incumbent rights and duties to the child can have significant consequences with respect to inheritance, custody, and visitation, as well as familial and relational stability. Cf. *In re C.L.*, 284 Ga. App. 674, 675–77 (2007) (discussing similar concerns with respect to custody in such situations).

With this background in mind, I turn to what I see as a serious gap in the relevant statutory law. On the one hand, if a petition to legitimate a child with an existing legal father is in fact an action to terminate that father's parental rights, see *Brine*, 291 Ga. at 379, then our current rule does not comport with the statutory process for terminating parental rights. See OCGA § 15-11-310 (providing grounds for termination of parental rights). Nor do the relevant statutes provide an alternative basis for determining whether to terminate the legal father's rights within the legitimation process.[3]

---

[3] While the legitimation petition process clearly articulates the best interest of the child standard for resolution of the ultimate question of granting the petition for legitimation, it provides no guidance on the question of what

OCGA § 19-7-20 et seq. It may be that our pronouncement in *Brine* was inartful and that the legitimation process is better viewed as a challenge to the presumption of legitimacy found in OCGA § 19-7-20. That is, rather than terminating rights, the legitimation process may better be understood as challenging the existence of the legal father's rights arising from his presumed paternity.

But the Code doesn't provide nuanced guidance about the process for assessing such a challenge beyond identifying the requirements for the legitimation petition itself. Nor does the Code indicate whether the presumption of legitimacy might become conclusive after some time or under other conditions. Moreover, understanding a legitimation action this way highlights another potential problem. Let's assume that a petitioner was successful in displacing the presumption of legitimacy, but unsuccessful in his own effort to legitimate.[4] The outcome of those efforts would leave

---

test or standard should be applied to the question of severing, terminating, or delegitimizing the presumed relationship.

[4] For example, suppose the DNA results excluded both the legal father and the proposed biological father as being the true biological father.

the previously legitimate child without any legal father and frustrate the law's clear intent to legitimate children quickly and conclusively.

I also wonder whether Georgia law actually allows a stranger to the marriage to challenge the presumption of legitimacy at all. On the one hand, the presumption of legitimacy exists by operation of law. No other action must occur for a child born of a married couple to be considered the legal child of the husband, meaning that a child born to a married couple appears to be legitimate at birth. On the other hand, petitions for legitimation can be brought by biological fathers of children "*born out of wedlock.*" See OCGA § 19-7-22. And to make matters more confusing, the Code defines a "child born out of wedlock" to include, in relevant part, a "child who is the issue of adulterous intercourse of the wife during wedlock" *or* a "child who is not legitimate within the meaning of Code Section 19-7-20." OCGA § 19-7-23. The definitional use of the disjunctive "or" notwithstanding, the statutory presumption of legitimacy means that a child can be both the issue of adulterous intercourse by a wife

*and* legitimate under OCGA § 19-7-20. In fact, this would seem to be the *entire point* of the presumption of legitimacy. Moreover, the historical common and statutory law was so robust in its protection of the presumption,[5] I am not entirely sure whether the definition of a "child born out of wedlock" would properly be understood as applying to a child presumed legitimate under OCGA § 19-7-20.[6] If that is the case, Georgia's law would present an interesting and, as best I can tell, unresolved question concerning the competing interests of the biological father and the legal father in this specific

---

[5] "The presumption of legitimacy was a fundamental principle of the common law. Traditionally, that presumption could be rebutted only by proof that a husband was incapable of procreation or had had no access to his wife during the relevant period." *Michael H. v. Gerald D.*, 491 US 110, 124 (1989) (plurality opinion) (citation omitted).

[6] To be clear, I am not suggesting a conclusive reading of OCGA § 19-7-22. There are suggestions in the text, like the requirement that the petition name a non-biological legal father as a party, that may suggest authority for this sort of claim. See OCGA § 19-7-22(c). There are, of course, additional definitions of legal fathers. See OCGA § 19-7-22(a)(2). The statutory definition of a "child born out of wedlock" creates an additional element of confusion that may result in one of those odd circumstances where a disjunctive is understood to mean a conjunctive. Again, without offering a conclusive reading of the provision and acknowledging the disjunctive nature of the definition, it strikes me as odd and unlikely that the General Assembly would define the same child to be legitimate under OCGA § 19-7-20 but illegitimate under OCGA § 19-7-23.

circumstance.[7]

The question of what makes a family is fundamental to the identity of a society. "The intangible fibers that connect parent and child have infinite variety. They are woven through the fabric of our society, providing it with strength, beauty, and flexibility." *Lehr v. Robertson*, 463 US 248, 256 (1983). Even the most rudimentary understanding of human history confirms that families come in a multitude of shapes and sizes and are made of different component parts, so to speak. See, e.g., *Moore v. City of East Cleveland, Ohio*, 431 US 494, 504–06 (1977) ("Ours is by no means a tradition limited to respect for the bonds uniting the members of the nuclear family. The tradition of uncles, aunts, cousins, and especially grandparents

---

[7] In *Michael H.*, a plurality of the Supreme Court opined that where a "child is born into an extant marital family, the natural father's unique opportunity conflicts with the similarly unique opportunity of the husband of the marriage, and it is not unconstitutional for the State to give categorical preference to the latter." 491 US at 129. And the concurring opinion which produces a majority there, while joining the plurality in affirming the grant of summary judgment to the legal father, suggests that an interest short of legal parenthood may exist for a biological father in this circumstance. Id. at 132–36. And, in light of the disposition of that case, the Supreme Court did not engage in any analysis of the prospect of any constitutionally protected interest a legal father whose rights derive from the presumption of legitimacy might have under such circumstances.

sharing a household along with parents and children has roots equally venerable and equally deserving of constitutional recognition."); *Troxel v. Granville*, 530 US 57, 63 (2000) ("The demographic changes of the past century make it difficult to speak of an average American family. The composition of families varies greatly from household to household."). But the importance of a strong familial bond between a parent and a child remains constant and receives constitutional protection "in appropriate cases." *Lehr*, 463 US at 256. See also *Troxel*, 530 US at 65–66 (noting that parents have a "liberty interest" under the Fourteenth Amendment "in the care, custody, and control of their children," which "is perhaps the oldest of the fundamental liberty interests recognized by this Court"); *Smith v. Org. of Foster Families for Equality & Reform*, 431 US 816, 838–39 (1977) ("freedom of personal choice in matters of family life is one of the liberties protected by the Due Process Clause of the Fourteenth Amendment"); *Brooks v. Parkerson*, 265 Ga. 189, 192 (1995) ("Parents have comparable interests under our state constitutional protections of liberty and privacy rights.").

To some, "the usual understanding of 'family' implies biological relationships, and most decisions treating the relation between parent and child have stressed this element." *Smith*, 431 US at 843. "But biological relationships are not [the] exclusive determination of the existence of a family. The basic foundation of the family in our society, the marriage relationship, is of course not a matter of blood relation." Id. Moreover, "[n]o one would seriously dispute that a deeply loving and interdependent relationship between an adult and a child in his or her care may exist even in the absence of blood relationship." Id. at 844.

At the same time, a biological father who is not married to his child's mother but nevertheless has established a substantial parent-child relationship with his child may have a constitutionally protected interest in that relationship. See *Lehr*, 463 US at 261–62. See also *Mathenia*, 308 Ga. at 720–21 ("unwed fathers possess an opportunity interest to develop a relationship with their children that is protected by due process of law" (citation and punctuation omitted)). But that interest has been held insufficient to displace the

14

interest of a legal father whose parental rights rest on a "conclusive presumption" in state law. *Michael H.*, 491 US at 129–30.

With the foregoing in mind, I am left uncertain about the proper test, procedure, and disposition in cases where a stranger to a marriage seeks to assert parental rights to a child born to a married couple. While I am uncomfortable with uncertainty in the law, I am far more uncomfortable with the prospect of judges being responsible for making the policy decisions that are necessary to provide clarity in this context. So I concur in the denial of the petition for certiorari. In doing so, I express my sincere hope that the General Assembly will examine the current state of the Code, the interpretation we leave in place today, and the constitutional interests described in the relevant decisional law. If the law of Georgia is not correctly captured by the decision of the Court of Appeals that we leave in place, I hope the General Assembly will see fit to provide direction through the legislative process.

I am authorized to state that Justice Colvin joins in this concurral.

15