**THIRD DIVISION**
**ANDREWS, P. J.,**
**DILLARD and MCMILLIAN, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules/**

**September 5, 2013**

# In the Court of Appeals of Georgia

A13A1602; A13A1603. IN THE INTEREST OF E. N. R. et al.

DILLARD, Judge.

In this consolidated appeal, the mother and father of four minor children appeal an order of the juvenile court finding their children deprived. The parents contend on appeal that the evidence was insufficient to support the juvenile court's judgment. For the reasons set forth *infra*, we affirm the juvenile court's judgment.

The record reflects that on August 23, 2012, the Department of Family and Children Services ("the Department") filed complaints for deprivation as to 1-year-old E. N. R., 3-year-old J. W. R., 4-year-old J. W. R., and 5-year-old M. N. R. The complaints alleged, *inter alia*, that the family's home had been condemned on August 15, 2012, and that the parents resisted efforts by the Department and refused to

cooperate with provided services in spite of a case plan developed after a prior removal.[1] The juvenile court issued an order for shelter care that same day.

Thereafter, on August 30, 2012 (*nunc pro tunc* August 27, 2012), the juvenile court issued a 72-hour hearing order that, "[b]ased upon the evidence presented and the consent of the parents," found probable cause to believe that the children were deprived. Thus, the court ordered the Department to maintain temporary custody of the children pending a deprivation petition and adjudicatory hearing. The Department subsequently filed a deprivation petition on August 31, 2012. And following a hearing on September 10, 2012, that was continued on September 17, 2012, the juvenile court issued an order that took judicial notice of its own record, continued custody with the Department, and ordered the parties to return in December for a progress hearing.

The juvenile court held a final hearing on the petition on December 17, 2012, and issued an order that day, taking judicial notice of its prior record and noting that

[1] The children were previously removed from the parents' home in October 2011 due to complaints of deprivation, but the trial court ultimately determined in April 2012 that, although removal had been appropriate, there was insufficient evidence of deprivation to grant the Department's petition for same. Accordingly, the court dismissed the petition but entered a protective order requiring "strict compliance with the Family Plan" and placing the parents "on notice that a subsequent removal of the children would be considered a second removal."

2

the "findings of the September order are a matter of record." The court then detailed

the services the Department continued to provide to the parents since September and

determined that it was "patently clear that although these parents love their children,

they are incapable of providing for their needs." Ultimately, the court concluded that

the children were deprived and decided that continuation in the parents' home would

be contrary to the children's welfare based on "the findings of the court's September

2012 order, and the fact that the parents are not mentally capable of learning how to

meet the daily basic care needs of the children, nor are they capable of providing for

them financially at this time." These appeals by the parents follow.

At the outset, we note that on appeal from a deprivation order, "we must view

the evidence in the light most favorable to the juvenile court's judgment to determine

whether any rational trier of fact could have found by clear and convincing evidence

that the [children were] deprived."[2] A child is deprived when he or she

> [i]s without proper parental care or control, subsistence, education as
> required by law, or other care or control necessary for the child's
> physical, mental, or emotional health or morals; . . . [h]as been placed
> for care or adoption in violation of law; . . . [h]as been abandoned by his

---

[2] *In the Interest of G. S.*, 279 Ga. App. 89, 91 (630 SE2d 607) (2006)
(punctuation omitted).

3

or her parents or other legal custodian; or . . . [i]s without a parent, guardian, or custodian.[3]

To authorize even a temporary loss of custody by a child's parent, "the deprivation must be shown to have resulted from unfitness on the part of the parent, that is, either intentional or unintentional misconduct resulting in the abuse or neglect of the child *or by what is tantamount to physical or mental incapability to care for the child*."[4] And in this regard, it is significant that "an order temporarily transferring custody of a child based on alleged deprivation must be grounded upon a finding that the child is at the present time a deprived child, and a finding of parental unfitness is essential to support an adjudication of present deprivation."[5]

In the case *sub judice*, viewing the evidence in the light most favorable to the trial court's judgment, there is clear and convincing evidence that the children were

---

[3] OCGA § 15-11-2 (8). As an aside, we note that Title 15 has been significantly revised by the General Assembly, with the revisions effective January 1, 2014. Ga. Laws 2013, Act. 127, Part V, § 5-1 ("This Act shall become effective on January 1, 2014, and shall apply to all offenses which occur and juvenile proceedings commenced on and after such date.").

[4] *In the Interest of G. S.*, 279 Ga. App. at 91-92 (emphasis supplied) (punctuation omitted).

[5] *Id.* at 92 (punctuation omitted).

deprived based on the parents' low level of functioning. At the December hearing, the court heard testimony from a placement prevention program director that the parents had not demonstrated an ability to retain information on what they were taught through Department services—for example, how to properly wash clothing. And in addition to the testimony presented at the December hearing, the juvenile court's final order took judicial notice of the September proceedings (for which the appellate record contains transcripts), and the order issued in September took judicial notice of the family's record as a whole.[6] The parents did not object to the taking of judicial

---

[6] *See In the Interest of A. B.*, 285 Ga. App. 288, 289 (645 SE2d 716) (2007) ("The judge had presided over prior proceedings involving appellant and her other two children and supported his findings of deprivation by taking judicial notice of these prior proceedings."). As to a trial court's ability to take judicial notice, we reiterate that in *Petkas v. Grizzard*, 252 Ga. 104 (312 SE2d 107) (1984), our Supreme Court held that "a trial court may take judicial cognizance . . . of records on file in its own court," *id.* at 108. In so holding, our Supreme Court explicitly overruled *Glaze v. Bogle*, 105 Ga. 295 (31 SE 169) (1898), and its progeny, which includes the following cases: *Outz v. Whitworth*, 248 Ga. 208 (281 SE2d 620) (1981); *Carr v. Car-Perk Servs., Inc.*, 222 Ga. 793 (152 SE2d 692) (1966); *Altman v. Fla.-Ga. Tractor Co.*, 217 Ga. 292 (122 SE2d 88) (1961); *King v. Pate*, 215 Ga. 593 (112 SE2d 589) (1960); *Salter v. Heys*, 207 Ga. 591 (63 SE2d 376) (1951); *Gray v. Bradford*, 194 Ga. 492 (22 SE2d 43) (1942); *Greene v. Transp. Ins. Co.*, 169 Ga. App. 504 (313 SE2d 761) (1984); *Recoba v. State*, 167 Ga. App. 447 (306 SE2d 713) (1983); *Kaplan v. Krosco, Inc.*, 167 Ga. App. 197 (306 SE2d 88) (1983); *Global Assocs., Inc. v. Pan Am. Commc'ns, Inc.*, 163 Ga. App. 274 (293 SE2d 481) (1982); *Int'l Indem. Co. v. Blakely*, 161 Ga. App. 99 (289 SE2d 303) (1982); *Carey v. Phillips*, 137 Ga. App. 619 (224 SE2d 870) (1976); *Doyle & Assoc., Inc. v. Blair*, 138 Ga. App. 314 (226 SE2d 109) (1976); *Thornton v. State*, 136 Ga. App. 655 (222 SE2d

5

notice and, furthermore, do not contend on appeal that the trial court in any way erred by taking judicial notice.[7] And because the transcripts and evidence from any proceedings prior to September 2012 were not included in the appellate record, "we must assume the juvenile court's findings and judgment to be correct."[8] In this regard, the September order contained findings that the mother suffered from a brain injury

158) (1975); *Watts v. Kundtz*, 128 Ga. App. 797 (197 SE2d 859) (1973); *Kazakos v. Baranan*, 122 Ga. App. 594 (178 SE2d 222) (1970); *Rossville Fed. Sav. & Loan Ass'n v. Ins. Co. of N. Am.*, 121 Ga. App. 435 (174 SE2d 204) (1970); *Boston Ins. Co. v. Barnes*, 120 Ga. App. 585 (171 SE2d 626) (1969); *Berrie v. State*, 119 Ga. App. 148 (166 SE2d 631) (1969); *Napier v. City Prods. Corp.*, 111 Ga. App. 327 (141 SE2d 552) (1965); *Turner v. Am. Mut. Liability Ins. Co.*, 109 Ga. App. 721 (137 SE2d 385) (1964); *Akins v. Beaver*, 98 Ga. App. 472 (106 SE2d 91) (1958); *Ga. Cas. & Sur. Co. v. Reville*, 95 Ga. App. 358 (98 SE2d 210) (1957); *Davenport v. S. R. R. Co.*, 42 Ga. App. 160 (155 SE2d 340) (1930); *O'Connor v. United States*, 11 Ga. App. 246 (75 SE 110) (1912).

[7] *See In the Interest of L. B.*, 319 Ga. App. 173, 175 (1) (735 SE2d 162) (2012) ("[Appellant] gives us no reason to believe that any objection to taking judicial notice of the deprivation order in this case would have had any merit, nor does she identify specific evidence that she would have brought forward to challenge the earlier deprivation order. For this reason, [appellant] cannot show that the taking of judicial notice is reversible error." (footnote omitted)); *accord In the Interest of C. B.*, 308 Ga. App. 158, 160 (2) n.4 (706 SE2d 752) (2011).

[8] *In the Interest of A. B.*, 285 Ga. App. at 289 (punctuation omitted); *see also In the Interest of C. B.*, 308 Ga. App. at 161 (3) n.5 ("The [appellant] did not include transcripts of the earlier proceedings or copies of the orders entered in those earlier proceedings in the record on appeal. Because he did not, we must presume that the evidence in those earlier proceedings, and the findings in the earlier orders, show precisely what the juvenile court said they show.").

that left her partially paralyzed and with memory deficiency, and that both parents were "low functioning" to the point of being unable to parent or supervise the children.

The finding regarding the mother's disability is supported by an unappealed 72-hour-hearing order that was issued in October 2011, to which the parents consented and of which the juvenile court took judicial notice when it did so as to the family's whole record.[9] As to the finding that the parents are low functioning, the first such finding of this appears in the court's September order and, as previously noted, the appellate record contains transcripts of the September 2012 proceedings. During argument in the September 10 proceeding, the Department referenced a "psychological previously entered in this Court's previous action" that "clearly show[ed] that the mother can't be on her own and the father is questionable." In a subsequent order issued in January 2013—after determining that the children were deprived—the court quotes extensively from psychological evaluations that it notes are "part of the court's record." These psychological evaluations apparently contained findings that, *inter alia*, the father has "borderline intellectual functioning with difficulty conceptualizing and with memory"; the father's "competency as a parent

---

[9] *See supra* notes 6-8.

7

is limited in that his ability to independently care for [the children] is questionable"; the father has "limited cognitive ability which is a barrier to his judgment about the children's needs for education and medical care"; the mother has "borderline intellectual abilities" with "many mannerisms and similarities to that of an 8 year old child"; the mother's "ability to competently parent her children is seriously limited"; and the mother's "insight, judgment, and decision-making are limited to such a degree that her children would be at risk of harm in her care without significant assistance." Accordingly, because the juvenile court took judicial notice of its record as a whole in September, which record apparently contained the psychological evaluations quoted extensively in the court's January order, there was evidence before the juvenile court that would support its finding that the children were deprived due to the parents' low level of functioning and the impact on their abilities to parent.[10]

---

[10] *See In the Interest of R. B.*, 309 Ga. App. 407, 409-11 (710 SE2d 611) (2011) (detailing evidence presented by Department, which included expert testimony by licensed clinical psychologist that mother had IQ of 72 with "borderline intellectual functioning," had difficulty communicating, would have difficulty applying what she learned in parenting classes, and would be "incapable of ever learning the skills necessary to properly care" for her child); *In the Interest of B. W.*, 287 Ga. App. 54, 60 (651 SE2d 332) (2007) (detailing evidence presented by Department, which included testimony by examining psychologist that, *inter alia*, "father's IQ placed him in the cognitively impaired range"); *In the Interest of H. E. M. O.*, 281 Ga. App. 281, 285 (1) (b) (636 SE2d 47) (2006) (detailing evidence presented by Department, which included testimony by psychologist who "concluded that [mother's] ability to

For all of the foregoing reasons, we affirm the juvenile court's judgment in both Case No. A13A1602 and Case No. A13A1603.

*Judgments affirmed. Andrews, P. J., concurs. McMillian, J., concurs specially.*

---

function in life was significantly low"); *In the Interest of B. J. F.*, 276 Ga. App. 437, 437 (623 SE2d 547) (2005) (detailing evidence presented by Department, which included testimony by evaluating psychologist that mother had "borderline intellectual functioning, evinced by her IQ of between 70 and 79"); *In the Interest of K. W.*, 272 Ga. App. 45, 50-51 (611 SE2d 713) (2005) (detailing evidence presented by Department, which included psychologist's testimony that mother's low IQ impacted cognitive functions); *In the Interest of J. W.*, 271 Ga. App. 518, 519 (610 SE2d 144) (2005) (detailing evidence presented by Department, including comprehensive psychological evaluation in which examiner "concluded that the father is mildly retarded with Full Scale IQ of 60"); *In the Interest of C. J. B.*, 239 Ga. App. 755, 755-56 (521 SE2d 891) (1999) (detailing evidence presented by Department, which included psychological evaluations showing that the parents had pronounced, significant cognitive impairment, resulting in "extremely low intellectual functioning"). *Compare In the Interest of D. W.*, 318 Ga. App. 725, 730 (3) (734 SE2d 543) (2012) ("There is no psychological evaluation included in the record, or reports from treating physicians, or medical reports indicating any mental impairment or how said mental impairment might limit the mother's parental abilities.").

A13A1602; A13A1603. IN THE INTEREST OF E. N. R. et al.

MCMILLIAN, Judge, concurring specially.

I concur specially to note that the record also supports by clear and convincing evidence the juvenile court's other finding of deprivation – that the parents were not capable of providing for the children financially. It was undisputed that the sole source of income was $637 in disability payments and $200 in food stamps, leaving $7 each month after paying bills. Although an additional $600 in food stamps could be obtained if the children were returned, there would still be an insufficient amount for other necessities such as clothing or gas. The parents' precarious financial situation was further demonstrated by the fact that the electricity had been turned off twice in the three months after the September hearing. And during that time, the

father did not find consistent employment[1] and had not followed through on an application for disability payments.

Accordingly, viewing the evidence in the light most favorable to the juvenile court's judgment, I believe that there was clear and convincing evidence that the children were deprived for the reasons stated in the majority's opinion and this special concurrence.

---

[1] Under a previous order, the father was permitted not to work while the children were in his custody, but there was no restriction precluding him from finding employment once the children were placed in the State's custody.