**FOURTH DIVISION**
**DILLARD, C. J.,**
**RAY, P. J., and SELF, J.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**September 27, 2017**

# In the Court of Appeals of Georgia

A17A1320. IN THE INTEREST OF C. H. et al., children.

SELF, Judge.

In this case involving the removal of three children from their parents' custody by the Coweta County Department of Family and Children Services ("DFCS"), the parents ask this Court to intercede and safeguard the constitutional and statutory rights afforded them before DFCS may take such a drastic measure. We agree with the parents' view that this "case is about much more than its individual facts. It is about the American legal system, about what our state and country require for every person brought before a court: fairness, respect, and a judicial system that should protect its citizens. . . ." As the record in this case amply supports the parents' claim that the juvenile court deprived them of their constitutional and statutory right to counsel, we reverse the juvenile court's order denying the parents' motion to set aside

the custody orders awarding temporary custody of their children to DFCS and instruct it to declare them null and void.

*Dependency and Judicial Review History.* The record on appeal demonstrates that the parents' history with DFCS began on or about January 3, 2015, when the parents' oldest child, Col. H., telephoned 911 to report a verbal altercation between the parents. Col. H. claimed to be afraid of the father, and law enforcement officers arrested the father and charged him with interference with a 911 call. When he was arrested, the father "smelled of a strong odor of alcohol" and admitted to consuming eight beers. Col. H. also described seeing drugs in the home, and both the father and the mother's sister confirmed that the mother abused drugs.

DFCS filed a dependency petition in June 2015. In July 2015, after an evidentiary hearing in which the parents stipulated to dependency, the juvenile court found that the children were dependent based upon the parents' alcohol and marijuana abuse.[1] Notwithstanding, the court concluded that continuation in the home would not be contrary to the welfare of the children and that the children could remain in the home provided the parents comply with certain conditions, including cooperating

---

[1] The parents did not appeal the dependency ruling.

2

with DFCS and any recommended domestic violence and drug or alcohol assessments/services.

After considering testimony and evidence at a disposition hearing the following month, the juvenile court found that the father had tested positive for marijuana and alcohol and the mother tested positive for amphetamines, methamphetamine, and marijuana. The children's guardian ad litem noted that the children were doing well with no concerns reported. The court continued legal custody of the children with the parents, but conditioned that placement upon the family's cooperation with DFCS and service providers, including counseling to address the parents' substance abuse and domestic violence issues, testing negative on future drug and alcohol screens, and ensuring that the maternal grandmother move into the home to serve as the children's primary caregiver.

Following judicial reviews on November 18, 2015, and December 9, 2015, the juvenile court continued custody with the parents, but again conditioned that placement on the family's compliance with the previously-stated conditions. The juvenile court noted that the parents were participating in counseling, but that the mother continues to abuse drugs while the father continues to abuse alcohol. During

the December review, the mother agreed to enter a residential drug treatment facility.

*The January 20, 2016 Judicial Review at Issue.* At the close of the December 9, 2015 judicial review, the juvenile court scheduled the January 20, 2016 judicial review at issue in this case and ordered the parents "to abide by each and every requirement of the Order of the Court." However, the juvenile court's order noting the December 9, 2015 hearing date was actually filed the day after the January 20, 2016 judicial review.

From the inception of the dependency action in June 2015, through and including the December 9, 2015 judicial review, the record shows that the parents were represented by the same counsel. On January 12, 2016, the parents' counsel executed a motion to withdraw "due to [the parents'] inability to follow legal advice." Counsel filed the motion on January 14, 2016, and certified that she served the parents with the motion by mail on January 12.[2] Counsel then appeared with the

---

[2] The parents' counsel's motion to withdraw was untimely. See Uniform Superior Court Rule 4.3 (1) ("An attorney . . . who wishes to withdraw as counsel for any party . . . shall submit a written request to an appropriate judge of the court for an order permitting such withdrawal. The request shall state that the attorney has given written notice to the affected client setting forth the attorney's intent to withdraw, that 10 days have expired since notice, and there has been no objection, or that withdrawal is with the client's consent."), 4.3 (2) ("[t]he attorney seeking

parents for the January 20, 2016 judicial review and immediately raised an apparent conflict of interest in representing both parents. The juvenile court initially asked the parents whether they "both still qualify for indigent representation or are you wanting to hire" another attorney and, upon learning their counsel was retained,[3] advised the parents that they "would need to hire another attorney[,]" to which the parents replied that they hired another attorney the day before who asked them to seek a continuance. The juvenile court stated that "we scheduled [the judicial review] for today and, it sounds like to me, I think you're asking for a continuance so you can secure . . . an attorney." After the juvenile court inquired as to the location of the children, counsel for DFCS offered a lengthy statement outlining her frustration resulting from the parents' unwillingness to complete counseling and in-patient treatment.

Rather than ruling on the parents' request for a continuance or further addressing their need for counsel, the juvenile court participated in an extended "discussion" between counsel for DFCS, the guardian ad litem, and the parents.

withdrawal shall provide a copy to the client by the most expedient means available due to the strict 10-day time restraint, i.e., e-mail, hand delivery, or overnight mail"); Uniform Juvenile Court Rule 25.2 ("This rule shall be in conformity with Superior Court Rule 4.3.").

[3] While counsel stated that she had been retained by the parents, her motion to withdraw alleged that she was the "[c]ourt appointed attorney" for the parents.

During this discussion, no witnesses were sworn and the juvenile court did not admit any evidence.[4] Likewise, the record shows that, after the initial exchange concerning her withdrawal, the parents' counsel did not participate in the hearing. Counsel for DFCS reported that *she believed* the children "are in immediate danger" due to the parents' ongoing substance abuse issues, the mother's continued residence in the home, the failure of either grandmother to reside in the home, and the children's chronic absences from school. She also offered extensive hearsay from multiple sources concerning the mother's alleged failure to diligently seek substance abuse treatment. In addition, counsel for DFCS and the juvenile court questioned the parents about several issues, including the children's school attendance.[5] As mentioned

_____

[4] Indeed, the court reporter's notation on the transcript confirms that there were "[n]o witnesses" and "[n]o exhibits[.]" However, the juvenile court did note that it had a copy of the mother's drug screen results in which she tested positive for "amphetamines, marijuana and methamphetamine." Although the document is not authenticated or complete, the record does contain a December 4, 2015 drug screen report demonstrating that the mother tested positive for amphetamine, marijuana, and methamphetamine.

[5] During this exchange, counsel for DFCS presented a school record detailing the two older children's absences. However, the document was not admitted as an exhibit and it does not appear from the record that the document was shown to the parents by either the court or DFCS's counsel. The juvenile court nonetheless relied upon the unauthenticated hearsay to justify removing the children from their parents' custody.

above, the parents' counsel interposed no objections to the considerable hearsay and undertook no effort to rebut the hearsay allegations through cross-examination or the offering of contradictory evidence. For his part, the guardian ad litem reported that he did not "necessarily [have] any issues there too much, except [the children are] missing school" and stated that the mother was scheduled to enter treatment the next day.

Again, at this point in the hearing, not a single witness had been sworn, examined or cross-examined. Likewise, the court had yet to admit a single piece of evidence. The parents were not given any meaningful chance to rebut the allegations made against them or to put up a case-in-chief. Moreover, the juvenile court, not counsel for DFCS, raised the issue of removing the children from the parents' custody for the first time, asking, "Is the Department asking for the kids to be picked up?" Counsel for DFCS then responded, "At this point, yes, your Honor. In the last year – we haven't had any cooperation. The mother has not addressed her substance abuse issues, and the father still has alcohol issues." The juvenile court cited its order from a prior judicial review and noted it required "both parents would continue counseling to address their current substance abuse issue and domestic violence issues, and test negative on future screens. That hasn't happened. None of it." When the mother

protested, the juvenile court responded that she was not "allowed to fail" drug screens and that

> [t]hat was part of the deal was, okay, I'm going to find that they're dependent. I'll let them stay in care. As long as [you] attend[] to your counseling, and as long as you don't test positive. And if you haven't attended to your counseling and you tested positive, you – the two things that I asked for in the protective order, you violated both.

The juvenile court then transferred custody of the children to DFCS "on a temporary basis due to the protective order." After that statement, the juvenile court suggested that the parents "get[] in touch with your attorney today" and then mentioned additional review "if we get an entry of appearance and we have a lawyer that comes in."

*The Juvenile Court's Order*. In its written order entered the day after the hearing, which was purportedly based upon "the evidence presented (the consent of the parties)"[6] and, more specifically, "the oral or written testimony offered by the parent(s), the custodian, the foster parent(s), and/or any pre-adoptive parents or relatives providing care for the child(ren) along with all testimony and evidence

---

[6] The transcript clearly and unequivocally shows that the parents did not consent to the removal of their children. On the contrary, the mother specifically begged the Court: "Please do not take the children."

8

presented in this case," the juvenile court granted the parents' counsel's motion to withdraw and denied the parents' motion to continue the hearing, stating that "[t]he parents report having retained a new attorney, but no entry of appearance has been filed." Of particular relevance, the juvenile court's order reflected that the parents were not represented by counsel during the judicial review, although a form portion of the order noted under an "other" category that the "court appointed attorney . . . was "present." Nonetheless, the juvenile court noted that the children

> were adjudicated dependent on July 15, 2015, and remained in the physical and legal custody of the parents under a Protective Order with the following terms: (1) The parents will follow all recommendations of their assessments[;] (2) The parents will participate in counseling to address their current substance abuse and domestic violence issues[;] [and] (3) The parents will submit to random drug screens and will test negative.

The juvenile court then found that the mother "failed to follow the terms of the protective order by continuing to test positive for methamphetamine, amphetamines and marijuana." Although the parents were to remain outside the home and the mother "agreed to enter in-patient rehab immediately" following the December 9, 2015 judicial review, the juvenile court determined that the mother failed to enter treatment despite the availability of bed space in an in-patient facility and that she

9

continued to reside in the home while "shuffl[ing]" the children "between the maternal grandmother and the parent's home." Similarly, the court found that the father continued to test positive for alcohol, did not report any treatment for alcohol abuse, and did not deny that he continued to reside in the home. Citing the children's numerous school absences,[7] the juvenile court concluded that the children "are suffering from educational neglect and can no longer safely remain in the custody of the parents." Ultimately, the juvenile court awarded temporary custody of the children to DFCS and scheduled the next review date for January 26, 2016.

*Arrest of the Parents*. The day after the January 20, 2016 judicial review, the juvenile court issued arrest warrants for the parents based upon an allegation from a DFCS case worker that the parents absconded with the children "[i]mmediately after court. . . ."[8] Thereafter, the record indicates that DFCS assumed custody of the

---

[7] See footnote 5, supra.

[8] Following their return to Georgia, the parents were each indicted for three counts of interstate interference with custody (OCGA § 16-5-45). The parents entered guilty pleas to each count pursuant to *North Carolina v. Alford*, 400 U.S. 25 (91 SCt 160, 27 LE2d 162) (1970) on January 23, 2017. The Coweta Superior Court sentenced each parent to five years probation on each count, to run concurrently, with the first 30 days to be spent in the Coweta County jail.

10

children in early February 2016, and placed the children with a foster family in Cobb County.

*Successive Judicial Reviews*. After it transferred custody of the children, the juvenile court held judicial reviews on April 13, 2016 and July 27, 2016, and a permanency hearing on October 19, 2016. At the April and July judicial reviews, the juvenile court continued custody in DFCS because the parents needed to make further progress on their reunification plan, but found that the parents had tested negative in recent drug and alcohol screens and were attending psychological and/or substance abuse counseling. The court further noted that the mother had completed intensive outpatient group substance abuse treatment and that the father had attended NA/AA meetings since March 2016. Both parents had also participated in visitation with the children with no issues reported.

Following the July hearing, the juvenile court observed that "the parents' attitude throughout the [July] hearing was insolent, and they continue to refuse to take responsibility for the children entering foster care, citing that they 'have done enough' to get their kids back." After speaking with the children, the juvenile court further stated that

11

[i]t is obvious the parents talk to [Con. H] about all the details of this case and the inner workings of DFCS, blaming everyone but themselves for their current predicament. It is clear the parents are trying to influence the children, which is causing severe anxiety and trauma for the children, particularly [Col. H]. The Court instructed the parents to never . . . talk to the children about DFCS, the Judge or this case again. If it happens, the parents will be held in contempt of court. The parents remained defiant during the admonishment from the court.

Finally, in the October 2016 permanency hearing, the juvenile court returned the children to the home, finding that the parents substantially complied with their reunification case plan. As a result, the juvenile court returned custody of the children to the parents in an October 19, 2016 order.

*Motion to Set Aside Null and Void Orders*. On September 23, 2016, the parents filed a "Motion to Set Aside Null and Void Orders," arguing that the juvenile court deprived them of their due process rights at the January 20, 2016 judicial review by: (1) denying the parents their right to counsel; (2) failing to administer oaths and receive witness testimony; (3) failing to provide the parents with adequate notice and an opportunity to be heard; and (4) failing to follow statutory procedures governing the transfer of custody in a dependency action. During the hearing on the parents' motion, the juvenile court challenged the parents' new counsel's statement that the

12

parents were without counsel during the January 20, 2016 judicial review, claiming that the parents' prior counsel "filed a motion to recuse [sic] which was not granted until after [the request to transfer custody of the children]." The parents' new counsel suggested that prior counsel withdrew during the January 20, 2016 judicial review, to which the juvenile court said, "[d]on't keep saying that. She was not withdrawn until I said she was withdrawn."[9] In offering its ruling at the close of the parties' arguments, the juvenile court observed:

> I will admit to you this was a frustrating case, and it was frustrating for a couple of reasons, most of which – and we're not adjudicating this again. I'm just telling you what my thought process is. You have a right to know what I was thinking on that day and today. Okay.
>
> There was an attempt by the court to work with the family time and time again, and there was a continual effort to thwart. There was no real buy-in from the family. . . . It was – there was never any acceptance of responsibility that perhaps my ideas of parenting were not in my children's best interest. And on that particular day I can tell you that I had given you . . . time and time again opportunities to just come forward and say "You're right. We need help, and what do we need to

---

[9] While technically accurate, this statement is undercut by the juvenile court's January 21, 2016 order in which it noted that the parents were not represented by counsel during the January 20, 2016 judicial review and the parents' counsel's lack of participation in the hearing once she asserted a conflict of interest.

do to make our lives and our children's lives better." I would have kept them there. But instead of working with us and instead of trying to get help, you did everything you could not to get help and not to go through the admittedly painful process of getting better. And at that point it was – it was you against me. It wasn't "Let's try to figure this out together. Let's try to help the kids as best we can." It was "How can I get around this judge who I don't like and who I think is wrong?"

And when I had been very specific with you in September and in December, I need for your mom to be part of the family. I need for her to be in there so that I have someone on the inside who I trust, who is not getting drunk and is not using drugs. I need someone there that I know is going to take care of the kids. And when I found out that she was not there anymore and that there was continued use and there was continued misrepresentations to the court, I didn't trust you anymore. I just stopped trusting you, and I felt it was in their best interest at that time.

The juvenile court cited its right, "specifically under [OCGA §] 15-11-32, . . . to modify my orders at any point in time that I feel that the children's safety is in danger, and that's what I did that day."

The juvenile court's written order denying the parents' motion to set aside recited the history of the parents' case and noted that, at least through the December 9, 2015 judicial review, "[t]he parents were, at all times, represented by paid

14

counsel." The juvenile court also recalled that "temporary custody [of the children] was transferred to [DFCS] based on the parents['] continued lack of progress and an allegation the children's immediate safety may be in jeopardy." In a ruling tantamount to a finding that the parents waived their right to counsel, the juvenile court stated that the January 20, 2016 judicial review "was set over a month prior" and observed that while the parents had spoken with another attorney to engage him, "[t]hey failed to [engage him] and the attorney they claimed to have talked to never filed an entry of appearance at any time." Accordingly, the juvenile court denied the parents' motion, and this appeal followed.

1. The parents argue that the juvenile court erroneously denied their motion to set aside the court's January 20 and 21, 2016 orders because the court violated certain of their due process rights, including their right to counsel. See OCGA § 15-11-103 (g). As a result, the parents contend that the orders are void. We agree.

(a) *"Void" Orders*. As a threshold matter, we note that "[w]hen the issue is a question of law, such as here . . ., we owe no deference to the trial court's ruling and apply the 'plain legal error' standard of review." *Oxmoor Portfolio, LLC v. Flooring & Tile Superstore of Conyers*, 320 Ga. App. 640, 641 (1) (740 SE2d 363) (2013).

15

"The judgment of a court having no jurisdiction . . . *or which is void for any other cause* is a mere nullity and may be so held in any court when it becomes material to the interest of the parties to consider it." (Emphasis supplied.) OCGA § 9-12-16. See also *Buckhorn Ventures, LLC. v. Forsyth County*, 262 Ga. App. 299, 301-302 (1) (585 SE2d 229) (2003) (order which incorporated terms of a settlement agreement, which itself was ultra vires, declared void); *Georgia Ports Auth. v. Hutchinson*, 209 Ga. App. 726, 730 (13) (a) (434 SE2d 791) (1993) (portion of judgment awarding punitive damages against state entity declared void). While the phrase "void for any other cause" does not appear to be specifically defined, our courts have recognized that the denial of a due process right in certain juvenile actions may result in a void judgment. See *McBurrough v. Dept. of Human Resources*, 150 Ga. App. 130, 131 (3) (257 SE2d 35) (1979).

(b) *Denial of Right to Counsel in Dependency Actions*. In *Sanchez v. Walker County Dept. of Family & Children Svcs.*, 237 Ga. 406 (229 SE2d 66) (1976), our Supreme Court applauded DFCS's important function in protecting children from mistreatment by their parents, but cautioned that

> wresting a child away from the care and custody of its parents is of serious consequence. *It is so drastic that it should be attended only by*

16

*the most stringent procedural safeguards.* It is with this in mind that a compliance with these procedural provisions [including the right to counsel] must be observed in the proceedings.

(Citation omitted; emphasis added.) Id. at 410-411. Stated more succinctly, constitutional rights are commandments, not suggestions.

OCGA § 15-11-103 (a) provides that "[a] child and any other party to a proceeding under this article shall have the right to an attorney at *all* stages of the proceedings under this article." (Emphasis supplied.) See, e.g., *Sanchez.*, 237 Ga. at 410-411 (parent is a "party"); *In the Interest of A. J.*, 269 Ga. App. 580, 581-582 (1) (604 SE2d 635) (2004). Moreover, OCGA § 15-11-103 (g) states that

[a] party other than a child shall be informed of his or her right to an attorney prior to any hearing. A party other than a child shall be given an opportunity to:

(1) Obtain and employ an attorney of such party's own choice;

(2) Obtain a court appointed attorney if the court determines that

such party is an indigent person; or

17

(3) Waive the right to an attorney.[10]

In addition to the parties' right to counsel, however, it is equally settled that an order by a juvenile court may "be changed, modified, or vacated on the ground that changed circumstances so require in the best interests of a child. . . ." OCGA § 15-11-32 (b).

Here, the record reveals that the juvenile court failed to follow OCGA § 15-11-103 (g) in its entirety. Although the juvenile court informed the parents "of [their] right to an attorney prior to [the January 20, 2016] hearing[,]" the juvenile court did not permit the parents an adequate opportunity to "[o]btain and employ an attorney of [their] own choice[.] . . ." OCGA § 15-11-103 (g) (1). In fact, the parents informed the juvenile court that they had retained counsel who asked the parents to obtain a continuance.[11] Nor did the juvenile court fully inquire whether the parents were

---

[10] "[T]o waive a right as fundamental as effective counsel, the trial court must, on the record, determine that the waiver is knowing, intelligent and voluntary." (Citation omitted.) *In the Interest of J. M. B.*, 296 Ga. App. 786, 789 (676 SE2d 9) (2009). See also *In the Interest of A. M. A.*, 270 Ga. App. 769, 776 (3) (607 SE2d 916) (2004) ("[W]hen presented with a non-indigent defendant who has appeared for trial without retained counsel, the trial judge has a duty to delay the proceedings long enough to ascertain whether the defendant has acted with reasonable diligence in obtaining an attorney's services and whether the absence of an attorney [is] attributable to reasons beyond [the defendant's] control.").

[11] In this regard, several of the juvenile court's statements in its order denying the parents' motion to set aside are concerning. First, the juvenile court's statement

18

indigent and, therefore, entitled to a court-appointed attorney. OCGA § 15-11-103 (g) (2). Likewise, the juvenile court certainly did not "delay the proceedings long enough to ascertain whether the defendant has acted with reasonable diligence in obtaining an attorney's services and whether the absence of an attorney is attributable to reasons beyond the defendant's control." (Citation omitted.) *A. M. A.*, 270 Ga. App. at 776 (3). Finally, the record contains no colloquy in which the parents waived their right to counsel.[12] See *In the Interest of J. M. B.*, 296 Ga. App. 786, 789 (676 SE2d

---

that the parents "failed" to retain counsel suggests a finding of fact that is not supported by the record. Indeed, other than the identity of the parents' new counsel, the juvenile court did not inquire of the parents concerning any detail of their representation. Second, the juvenile court's observation that the attorney with whom the parents apparently spoke "never filed an entry of appearance at any time" is not relevant to the denial of the parents' right to counsel at the January 20, 2016 judicial review. Finally, and perhaps most troubling, the juvenile court's statements that the parents failed "to timely secure alternate counsel" and that such a failure "is not cause for the court to grant a continuance" ignore that the parents' prior counsel's motion to withdraw was clearly untimely – filed only four business days and six calendar days prior to the January 20, 2016 judicial review. The juvenile court did not address this issue. Therefore, were we to uphold the juvenile court's January 20 and 21, 2016 orders, we would necessarily sanction the untimeliness of the parents' prior counsel's motion to withdraw. This we will not do.

[12] DFCS's position that the parents were not deprived of the right to counsel at the January 20, 2016 judicial review because they had taken steps to secure counsel who was not present is unpersuasive. Similarly, DFCS's contention that the juvenile court determined that the parents waived their right to counsel is not supported by the record. See fn. 10, supra.

19

9) (2009). As a result, the record conclusively demonstrates that the parents were denied their right to counsel at the January 20, 2016 judicial review. In view of this violation of the parents' due process rights, the January 20 and 21, 2016 orders by the juvenile court are void. See *Sanchez*, 237 Ga. at 410-411; *A. J.*, 269 Ga. App. at 581-582 (1); *McBurrough*, 150 Ga. App. at 131 (3).

(c) *Authority of Juvenile Court to Modify Its Own Orders*. In denying the parents' motion to set aside, the juvenile court justified its decision to award temporary custody of the children to DFCS upon its inherent authority to modify an order at any time based upon the best interests of the children. See OCGA § 15-11-32 (b).[13] However, no court possesses the authority to modify its orders while disregarding our bedrock requirement of due process.[14] Otherwise, Georgia's

---

[13] We note that at the time the juvenile court issued its dependency ruling, it initially described the conditions governing the children's placement in the home as a "Protective Order." However, these conditions did not constitute a protective order as defined in OCGA § 15-11-29. See *In the Interest of S. Y.*, 264 Ga. App. 623, 624-625 (1) (591 SE2d 489) (2003) (because order was a deprivation order which set additional conditions, rather than a protective order, the juvenile court "was not limited to the remedies established by [former] OCGA § 15-11-11."). Accordingly, the analysis in this case is not governed by the Code section regarding protective orders.

[14] DFCS's reliance upon *In the Interest of S. Y.*, 264 Ga. App. 623 (591 SE2d 489) (2003) is misplaced. While it is true, as DFCS suggests, that we "affirmed a juvenile court's modification of a prior deprivation order" in which a juvenile court

20

statutory right to counsel in dependency actions would be rendered hollow. In this case, the juvenile court failed to inquire fully concerning the parents' right to counsel. Nor did the juvenile court find that the parents waived their right to counsel. See, e.g., *J. M. B.*, 296 Ga. App. at 789. While the juvenile court appears to have reached the limit of its patience with the parents, no amount of frustration, even if understandable, will justify the denial of a parent's right to counsel. See generally *A. M. A.*, 270 Ga. App. at 776 (3) ("The fact that there appears to be more than sufficient evidence to support the termination of appellant's parental rights does not relieve the juvenile court of its obligation to determine whether trial counsel should have been appointed for appellant."). "Quite simply, [the parents'] rights were not sufficiently guarded in this case as a result of the denial of counsel." *J. M. B.*, 296 Ga. App. at 791. In failing to ensure that the parents were aware of and either exercised or waived their right to

_____

temporarily transferred custody of two children from the mother to DFCS, we specifically noted that "[t]here was *testimony* at the [judicial review] hearing that the mother had not complied with the conditions contained in the [deprivation] order." (Emphasis supplied.) Id. at 624 (1). Although earlier testimony in this case supported the juvenile court's finding of dependency, there was no testimony (or evidence of any sort), at the January 20, 2016 judicial review at which the juvenile court transferred temporary custody of the children to DFCS, that the mother "had not complied with the conditions" in the dependency order. See id. Moreover, there is no indication in *S. Y.* that the mother's right to counsel had been violated. Accordingly, *S. Y.* is inapposite.

counsel, the juvenile court violated a due process right of the parents and its January 20 and 21, 2016 orders are void as a result.[15]

In closing, nothing in this opinion should be read to curtail a juvenile court's inherent authority to modify its own orders. See OCGA § 15-11-32 (b). Rather, we hold simply that any such modification by the juvenile court must comport with the requirements of due process, including the protection of a parent's right to counsel, either of the parent's choosing or by appointment. See, e. g., OCGA § 15-11-103 (g); *A. J.*, 269 Ga. App. at 581-582 (1); *McBurrough*, 150 Ga. App. at 131 (3). Because the juvenile court in this case did not afford the parents the right to counsel at the judicial review at which it awarded custody of the children to DFCS, its January 20 and 21, 2016 orders are void. It necessarily follows that the juvenile court erred in denying the parents' motion to set aside the January 20 and 21, 2016 orders, and we

---

[15] We further conclude that the parents' challenge to the January 20 and 21, 2016 orders is not precluded by collateral estoppel, because the order from the parents' criminal case which declined to set aside the juvenile court's January 20 and 21, 2016 orders was not a final order at the time of the ruling at issue in this appeal. See, e. g., *Greene v. Transport Ins. Co.*, 169 Ga. App. 504, 506 (3) (313 SE2d 761) (1984) ("[A] judgment sought to be used as a basis for the application of the doctrine of res judicata or collateral estoppel must be a final judgment. In Georgia a judgment is suspended when an appeal is entered within the time allowed. And the judgment is not final as long as there is a right to appellate review.") (citations and punctuation omitted).

reverse the juvenile court and remand with instructions to enter an order declaring the January 20 and 21, 2016 judicial review orders awarding temporary custody of the children to DFCS null and void.

2. Although our ruling in Division 1 renders moot the parents' remaining arguments, we are by no means condoning any additional procedural irregularities that occurred during the January review hearing. The Juvenile Code clearly contemplates that witnesses must be sworn and subject to cross-examination, hearsay will not be allowed (unless under a statutory exception), parties have the right to confront witnesses, and rules of evidence regarding the introduction of exhibits should be followed. Like the right to counsel, these rights are not optional.[16]

*Judgment reversed and case remanded with direction. Dillard, C. J., and Ray, P. J., concur fully and specially.*

---

[16] DFCS' motion to dismiss this appeal as moot is denied. As a result of the parents' violation of the juvenile court's January 20 and 21, 2016 orders (which we have found to be void in Division 1 (b), supra), the parents were indicted for interstate interference with custody and ultimately entered pleas of guilty. See fn. 8, supra. Accordingly, in view of the parents' felony convictions based upon void orders, the parents' appeal is not moot. See generally *In the Interest of I. S.*, 278 Ga. 859, 862 (607 SE2d 546) (2005) ("a matter does not become moot if adverse collateral consequences continue to plague the affected party").

A17A1320. IN THE INTEREST OF C. H. et al., children.

DILLARD, Chief Judge, concurring fully and specially.

I fully concur with the majority's well-reasoned opinion. Specifically, I agree with the majority that, because the parents were denied their constitutional and statutory right to counsel at the January 2016 judicial review, the resulting orders are void, and we need not separately address any of the parents' remaining arguments. Nevertheless, given the deeply troubling nature of this case, I write separately to discuss my concerns about the trial court's failure to recognize or safeguard the parents' constitutional right to familial relations with their children.

Juvenile courts must be mindful that in every case, regardless of any perceived authority given to them by Georgia's Juvenile Code to interfere with a natural parent's custodial relationship with his or her child, such authority is *only* authorized if it comports with the long-standing, fundamental principle that "[p]arents have a constitutional right under the United States and Georgia Constitutions to the care and custody of their children."[1] In this respect, the Supreme Court of the United States has

---

[1] *Clark v. Wade*, 273 Ga. 587, 596 (IV) (544 SE2d 99) (2001) (plurality opinion); *see Meyer v. Nebraska*, 262 U.S. 390, 399 (43 SCt 625, 67 LE2d 1042) (1923) (noting that the "liberty interest guaranteed by the Fourteenth Amendment [to the United States Constitution] includes freedom to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home[,] and *bring up children*, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men." (punctuation omitted and emphasis supplied)); *see also Prince v. Massachusetts*, 321 U. S. 158, 166 (64 SCt 438, 88 LEd 645) (1944) (noting that there is "a private realm of family life which the state cannot enter"); *Pierce v. Soc'y of the Sisters of the Holy Names of Jesus & Mary*, 268 U.S. 510, 535 (45 SCt 571, 69 LEd 1070) (1925) ("The child is not the mere creature of the state; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations."); *In the Interest of M. F.*, 298 Ga. 138, 144-45 (2) (780 SE2d 291) (2015) ("The presumption that children ordinarily belong in the care and custody of their parents is not merely a presumption of the statutory and common law, but it has roots in the fundamental constitutional rights of parents. The Constitution secures the fundamental right of parents to direct the upbringing of their children, and it protects a private realm of family life which the state cannot enter without compelling justification." (punctuation and citation omitted)); *Brooks v. Parkerson*, 265 Ga. 189, 191 (2) (a) (454 SE2d 769) (1995) ("The U.S. Supreme Court has long recognized a constitutionally protected interest of parents to raise their children without undue state interference.").

2

acknowledged that "[t]he liberty interest . . . of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests . . . ."[2] Moreover, although a parent's right to raise his or her children without state interference is largely expressed as a "liberty" interest, the Supreme Court of the United States has also noted that this right derives from "privacy rights" inherent in the text, structure, and history of the federal constitution.[3]

---

[2] *Troxel v. Granville*, 530 U.S. 57, 65 (II) (120 SCt 2054, 147 LE2d 49) (2000) (plurality opinion); *see id.* at 68 (II) (noting the constitutional presumption that "fit parents act in the best interests of their children"); *Parham v. J. R.*, 442 U.S. 584, 602 (III) (b) (99 SCt 2493, 61 LE2d 101) (1979) (noting that the federal constitution's "concept of the family rests on a presumption that parents possess what a child lacks in maturity, experience, and capacity for judgment required for making life's difficult decisions," and that "natural bonds of affection lead parents to act in the best interest of their children"); *see also* 2 ST. GEORGE TUCKER, BLACKSTONE'S COMMENTARIES WITH NOTES OF REFERENCE TO THE CONSTITUTION AND LAWS OF THE FEDERAL GOVERNMENT OF THE UNITED STATES AND THE COMMONWEALTH OF VIRGINIA 446 (Birch & Small 1803) ("The duty of parents to provide for the maintenance of their children is a principle of natural law."); 2 JAMES KENT, COMMENTARIES ON AMERICAN LAW 169 (O. Halsted 1827) (noting that "[t]he rights of parents result for their duties [to their children]," and "the law has given them such authority"); JOHN LOCKE, SECOND TREATISE OF GOVERNMENT, Ch. 6, § 71 (Hackett Publishing Co., Inc. 1980, originally published in 1690) ("This shews the reason how it comes to pass, that *parents in societies*, where they themselves are subjects, retain a *power over their children*, and have as much right to their subjection, as those who are in the state of nature.").

[3] *See Brooks*, 265 Ga. at 191-92 (2) (a); *see* also *Clark*, 273 Ga. at 596 (IV) ("Under the Due Process Clause of the Fourteenth Amendment, and our state constitution, parents have a fundamental liberty interest *and privacy right* in raising

3

In Georgia, a parent's natural right to familial relations is also recognized "under our state constitutional protections of liberty and privacy rights."[4] Indeed, Georgia courts have repeatedly recognized that "the constitutional right to raise one's children is a fiercely guarded right in our society and law, and a right that should be infringed upon only under the most compelling circumstances."[5] In fact, according to our Supreme Court, "there can scarcely be imagined a more fundamental and fiercely guarded right than the right of a natural parent to [his or her] offspring."[6] And particularly relevant to the admittedly "frustrating" circumstances of this case, the

their children without undue state influence." (emphasis supplied); *see, e. g.*, *Prince*, 321 U.S. at 165 (recognizing a parent's authority over rearing his or her children and the right of a parent to control over and training of her child as "sacred private interests" that are "basic in democracy").

[4] *Brooks*, 265 Ga. at 191 (2) (a). *Cf. Powell v. State*, 270 Ga. 327, 330-31 (2) (510 SE2d 18) (1998) ("[T]he 'right to be let alone' guaranteed by the Georgia Constitution is far more extensive tha[n] the right of privacy protected by the U.S. Constitution, which protects only those matters 'deeply rooted in this Nation's history and tradition' or which are 'implicit in the concept of ordered liberty.'").

[5] *In the Interest of D. M.*, 339 Ga. App. 46, 52 (793 SE2d 422) (2016) (punctuation omitted); *accord In the Interest of J. C.*, 242 Ga. 737, 738 (1) (251 SE2d 299) (1978); *In the Interest of S. O. C.*, 332 Ga. App. 738, 743 (774 SE2d 785) (2015); *In the Interest of J. V. J.*, 329 Ga. App. 421, 425 (765 SE2d 389) (2014); *In the Interest of C. J. V.*, 323 Ga. App. 283, 283 (746 SE2d 783) (2013); *In the Interest of M. A.*, 280 Ga. App. 854, 856 (635 SE2d 223) (2006).

[6] *In the Interest of M. F.*, 298 Ga. at 145 (2) (punctuation omitted); *accord Floyd v. Gibson*, 337 Ga. App. 474, 479 (1) (788 SE2d 84) (2016).

4

"fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents. . . ."[7] Put another way, the focus of a determination of whether a parent is fit for the purposes of custody

> must be the parent's ability to provide for the children in a manner sufficient to preclude the need for an entity of the government to intervene and separate the children from the parent, and a court is not permitted to terminate a parent's natural right to custody merely because it believes that the children might have better financial, educational, or moral advantages elsewhere, that is, the parent's ability to raise his children is not to be compared to the fitness of a third person.[8]

To be sure, parental rights are not absolute. But when this fundamental liberty interest is at stake, the court must "give full, fair, and thoughtful consideration to the serious matter at hand."[9]

---

[7] *In the Interest of M. F.*, 298 Ga. at 145 (2); *accord Santosky v. Kramer*, 455 U.S. 745, 753 (II) (102 SCt 1388, 71 LE2d 599) (1982); *In the Interest of S. O. C.*, 332 Ga. App. at 746-47 (3).

[8] *Floyd*, 337 Ga. App. at 479 (1); *accord Harris v. Snelgrove*, 290 Ga. 181, 182 (2) (718 SE2d 300) (2011); *Wade v. Wade*, 272 Ga. 526, 527 (1) (531 SE2d 103) (2000).

[9] *Floyd*, 337 Ga. App. at 479 (1).

In construing our Juvenile Code to comport with these constitutional safeguards, we have explained that there are three constitutionally based presumptions in making a custody determination: "(1) the parent is a fit person entitled to custody, (2) a fit parent acts in the best interest of his or her child, and (3) the child's best interest is to be in the custody of a parent."[10] Furthermore, we have also emphasized that "[t]o authorize even a *temporary* loss of custody by a child's parent, the [dependency][11] must be shown to have resulted from unfitness on the

---

[10] *Brawner v. Miller*, 334 Ga. App. 214, 216 (778 SE2d 839) (2015) (punctuation omitted); *accord Clark*, 273 Ga. at 593 (II); *Trotter v. Ayres*, 315 Ga. App. 7, 8-9 (2) (726 SE2d 424) (2012); *Galtieri v. O'Dell*, 295 Ga. App. 797, 798 (673 SE2d 300) (2009).

[11] Our old Juvenile Code was substantially revised in 2013, and the new Juvenile Code applies to this case because it was initiated in 2015, after the revisions were enacted. *See In the Interest of M. F*., 298 Ga. at 138 n.1; Ga. L. 2013, p. 294. And "[t]oday, the law no longer speaks of a 'deprived child,' but instead refers to a 'dependent child.'" *In the Interest of M. F*., 298 Ga. at 138 n.1. Although this case was decided under the new Juvenile Code, several of the cases relied upon in this concurrence regarding the requirements to justify the removal of a child from his or her parent's custody or the termination of parental rights were decided under the old Code and use the terms "deprived" and "deprivation," rather than "dependent" and "dependency." Nevertheless, given the similarities between the definitions of these terms, Georgia courts have repeatedly indicated that, to the extent that there is any meaningful distinction between a "deprived child" under the old Code and a "dependent child" under the new Code, it is an unimportant one in cases involving child custody or termination of parental rights. *See id.* at 144 (2) (explaining that the reappearance of a fit parent is a material change in circumstances that can render a child no longer "deprived" *or* "dependent" for purposes of a custody determination);

6

part of the parent, that is, either intentional or unintentional misconduct resulting in the abuse or neglect of the child or by what is tantamount to physical or mental incapability to care for the child."[12]  Significantly, an order temporarily transferring custody of a child based on alleged dependency "must be grounded upon a finding that the child is at the *present* time a [dependent] child, and a finding of parental unfitness is essential to support an adjudication of present [dependency]."[13] And, of

---

*In the Interest of C. J. V.*, 333 Ga. App. 844, 847-48 (2) (777 SE2d 692) (2015) (noting the similarities between the statutory definitions of "deprived" and "dependent" and rejecting a mother's argument that there was insufficient evidence to support the termination of her parental rights merely because the juvenile court, in a case in which the new Code applied, found her child "deprived" rather than "dependent");  *In the Interest of G. R. B.*, 330 Ga. App. 693, 693 n.1 (769 SE2d 119) (2015) (setting forth the similarities in the statutory definitions of "deprived" and "dependent," and noting that, even though the juvenile court improperly used "dependent" in its order, this Court would use "deprived" instead because the old Juvenile Code applied at the time the petitions were filed). For purposes of consistency and because the new Code applies, I am only using the terms "dependent" and "dependency" in this separate opinion.

[12] *In the Interest of E. N. R.*, 323 Ga. App. 815, 816 (748 SE2d 293) (2013) (punctuation omitted); *accord  In the Interest of G. R. B.*, 330 Ga. App. at 700-01; *In the Interest of S. D.*, 316 Ga. App. 86, 86 (728 SE2d 749) (2012); *In the Interest of J. H.*, 310 Ga. App. 401, 402 (713 SE2d 472) (2011).

[13]  *In the Interest of E. N. R.*, 323 Ga. App. at 816 (punctuation omitted and emphasis supplied); *accord  In the Interest of G. R. B.*, 330 Ga. App. at 700.

7

course, the child's present dependency must always be *proved in court* by clear and

convincing evidence.[14]

Here, the parents were deprived of several constitutional rights, including their

right to an attorney, to notice that custody would be an issue at the hearing, and to

confront witnesses and otherwise defend themselves.[15] But perhaps the most troubling

[14] *See, e.g.*, *Brawner*, 334 Ga. App. at 216; *In the Interest of G. R. B.*, 330 Ga. App. at 698; *In the Interest of E. N. R.*, 323 Ga. App. at 816 *In the Interest of S. D.*, 316 Ga. App. at 86. Here, the sole basis for the juvenile court's custody decision appears to be educational neglect. But, again, no witness testimony or other evidence was presented to support the court's finding.

[15] Like the majority, I too am concerned with the juvenile court's conflicting statements regarding whether the parents were represented by counsel at the January 2016 hearing. At the time of that hearing, the court was informed that their counsel wanted to withdraw due to a conflict of interest (as well as the fact that the parents had retained new counsel), and it expressly confirmed its understanding that the parents were "asking for a continuance so [they] [could] secure . . . an attorney." But then, at the 2017 hearing on the motion giving rise to this appeal, the court admonished the parents' current counsel for even suggesting that the parents were unrepresented at the earlier hearing. And when the court noted that the parents had several previous attorneys, their current counsel aptly responded that, regardless, "the constitution is the constitution." Then, after insisting that the parents *had* been represented by counsel at the 2016 hearing, the juvenile court's order denying the parents' motion to set aside the custody order suggested that the parents somehow forfeited their right to counsel at the January 2016 hearing by their own conduct. There is a complete absence of evidence to support that finding, especially given the untimely nature of the parents' prior counsel's withdrawal and the court's admitted understanding that the parents had recently obtained new counsel, who instructed them to ask for a continuance.

aspect of this case is that the parents' right to the custody, care, and control over their own children was almost entirely ignored when the court removed these children from their parents' custody without the State presenting *a single witness or a piece of evidence.* Under such egregious circumstances, there could not have possibly been proof of the compelling circumstances or the clear and convincing evidence necessary to justify severing, even temporarily, the custodial relationship between parents and their children. Then, to make matters even worse, the void custody order resulted in the parents having felony convictions for exercising their constitutionally protected rights to travel to another state with their own children.

In its defense, the State appears to argue that Georgia's Juvenile Code and various opinions of this Court give juvenile courts the carte blanche ability to change, modify, or vacate any prior order to remove children from their parents' custody, so

Given the foregoing, it does not appear that, as to the parents' constitutional right to counsel, the juvenile court gave "full, fair, and thoughtful consideration to the serious matter at hand." *Floyd*, 337 Ga. App. at 479 (1). Moreover, not only did the State not present *any* witness testimony or other evidence at the January 2016 hearing and not only did the vast majority of the hearing consist of a lengthy discussion between the State's attorney and the court, the State also suggested later that the parents did not even have a right to personally respond or participate in the hearing. Indeed, although the parents only spoke on their behalf a handful of times during the January 2016 hearing and their former attorney did not participate at all, the State's attorney later complained that "[t]he parents were constantly interrupting during the hearing."

9

long as, at some previous time, the children were determined to be dependent. Specifically, the State primarily relies on OCGA § 15-11-32 (b), which provides: "An order of the court may also be changed, modified, or vacated on the ground that changed circumstances so require in the best interests of a child except an order of dismissal following a contested adjudicatory hearing." This is nonsense on stilts. Suffice it to say, construing OCGA § 15-11-32 (b) in the manner suggested by the State would allow juvenile courts to arbitrarily deprive parents of their constitutional rights to the custody of their own children without any evidentiary basis and without proof of *present* dependency, which would render the statute patently unconstitutional. And as we have repeatedly emphasized, *all* statutes and other Georgia law must be construed in such a way that comports with our state and federal constitutions.[16] For this reason alone, the State's argument is a nonstarter.

---

[16] *See Dev. Auth. of DeKalb Cty. v. State*, 286 Ga. 36, 38 (1) (684 SE2d 856) (2009) (recognizing that "all presumptions are in favor of the constitutionality of an act of the legislature" (punctuation omitted); *Buice v. Dixon*, 223 Ga. 645, 647 (157 SE2d 481) (1967) ("[I]t is well settled in this jurisdiction that all statutes are presumed to be enacted by the legislature with full knowledge of the existing condition of the law and with reference to it; that they are to be construed in connection and in harmony with the existing law; and that their meaning and effect will be determined in connection, not only with the common law and *the Constitution*, but also with reference to other statutes and the decisions of the courts" (punctuation omitted and emphasis supplied)); *Strickland v. State*, 137 Ga. 1, ___ (1) (72 SE 260) (1911) ("[W]henever an act of the Legislature can be so construed as to avoid conflict

I take this opportunity, then, to remind our juvenile courts *and the State* that, in making any decision or taking any action that interferes with a parent-child relationship, our Juvenile Code and established case law is subordinate to and must be construed in light of the fundamental rights recognized by the federal and Georgia constitutions. As this Court has rightly recognized, "[t]he constitutional right of familial relations is not provided by government; it preexists government."[17] Indeed, this "cherished and sacrosanct is not a gift from the sovereign; it is our natural birthright. Fixed. Innate. Unalienable. "[18] Thus, regardless of a court's (or any other state actor's) personal feelings or perception of a parent's fitness to care for or retain

_____

with the Constitution, such construction will be adopted by the courts, and that the act was not unconstitutional."); *In the Interest of D. M.*, 339 Ga. App. at 51 (noting that statutes purporting to govern the termination of parental rights must be construed in light of the "overarching constitutionally based principle" that the termination of parental rights is a "remedy of last resort which can be sustained only when there is clear and convincing evidence that the cause of deprivation is likely to be continued"); *Wright v. Brown*, 336 Ga. App. 1, 4-5 (2) (783 SE2d 405) (2016) (noting that, in considering the contextual backdrop of a statute, "we may look to other provisions of the same statute, the structure and history of the whole statute, and the other law—constitutional, statutory, and common law alike—that forms the legal background of the statutory provision in question" (punctuation omitted and emphasis supplied)).

[17] *In the Interest of E. G. L. B.*, ___ Ga. App. ___, slip op. at 19 (Case No. A17A0881, decided September 20, 2017).

[18] *Id.* (punctuation and citation omitted).

11

custody of his or her child, proof must still be tendered and careful consideration of these bedrock constitutional principles and safeguards must remain central to each case without exception. And when this fails to occur, we will not hesitate to remind our juvenile courts *and the State* of its solemn obligation to safeguard the parental rights of the citizens it serves.

I am authorized to state that Presiding Judge Ray joins in this concurrence.